# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.  1:15 -Civ-23840-JEM

**JEFFREY PARKER** *et al.,* individually and on behalf of all others similarly situated,

|  |  |
|---|---|
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | **CLASS ACTION** |
| **AHMSI INSURANCE AGENCY INC. d/b/a BELT LINE INSURANCE AGENCY**, *et al*., | |
| Defendants. | **JURY TRIAL DEMANDED** |

**GELBER SCHACHTER & GREENBERG, P.A.**
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
DAN S. GELBER
Florida Bar No. 512877
dan@gsgpa.com
JARRED L. REILING
Florida Bar No. 93930
jreiling@gsgpa.com
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131-3224
Tel: (305) 728-0950
Fax: (305) 728-0951

*Liaison Counsel for Plaintiffs*

**KIRBY McINERNEY LLP**
MARK A. STRAUSS
mstrauss@kmllp.com
THOMAS W. ELROD
telrod@kmllp.com
825 Third Avenue, 16th Floor
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

Dated:  March 8, 2016

## TABLE OF CONTENTS

TABLE OF EXHIBITS ............................................................................................................ ii

I.      SUMMARY OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................ 6

III.    PARTIES .................................................................................................................. 7

        A.      Plaintiffs ....................................................................................................... 7

        B.      Defendants .................................................................................................... 8

                1.      Homeward, Beltline, and Friedman ................................................. 8

                2.      The WL Ross Defendants ................................................................. 9

                3.      The QBE Defendants ...................................................................... 11

IV.     SUBSTANTIVE ALLEGATIONS ........................................................................ 12

        A.      Background ................................................................................................. 12

                1.      Lender-Placed Insurance and Mortgage Servicing Rights ........... 12

                2.      WL Ross's Acquisition of AHMSI ................................................ 15

        B.      AHMSI's Entry Into a Six-Year Exclusive Arrangement With ZC Sterling ........ 15

        C.      QBE Insurance Group's Acquisition of ZC Sterling ................................. 18

        D.      The Fraudulently Concealed Premium Rebates ......................................... 18

                1.      The "Upfront Bonus" of $9.7 Million Paid Under the Guise of
                        Compensating Homeward for Fictitious "Marketing Services" .............. 19

                2.      The $135 Million in Warrants which were Siphoned Off by the WL Ross
                        Funds .............................................................................................. 21

                3.      The More Than $16 Million in Supposed "Commissions" for Nonexistent
                        "Brokerage" Services ..................................................................... 23

                4.      The More Than $25 Million in Essentially Free Outsourced Mortgage
                        Servicing Services .......................................................................... 27

        E.      The Fraudulent and Deceptive Nature of the Scheme ............................... 29

        F.      The Extortionate Nature of the Scheme ..................................................... 34

i

G.   The Absence From this Lawsuit of Any Challenge to the Filed Rates ................ 35

V.   THE NEW YORK STATE INVESTIGATION OF THE LPI INDUSTRY ................... 36

A.   Superintendent Lawsky Launches an Investigation ............................................... 36

B.   QBE and Homeward Admit to the Essential Facts Regarding the Premium Rebates ........................................................................................................ 37

C.   QBE Pays New York $10 Million to Settle LPI-Related Claims ......................... 38

VI.   FANNIE MAE UNSUCCESSFULLY ATTEMPTS TO PUT AN END TO THE OVERCHARGES ........................................................................................... 39

A.   Fannie Mae Seeks Independent, Kickback-Free Bids for LPI and Loan Servicing Outsource Services ............................................................................................... 39

B.   The LPI Industry, Led by QBE, Lobbies the FHFA to "Spike" the Fannie Mae RFP ............................................................................................................ 43

C.   The OIG of the FHFA Recommends that Fannie Mae Consider Suing QBE ...... 44

VII.   WL ROSS'S DOMINATION AND CONTROL OF HOMEWARD ............................. 45

VIII.   THE TOLLING OF THE STATUTES OF LIMITATIONS ............................................ 51

IX.   CLASS ACTION ALLEGATIONS ................................................................................. 54

# TABLE OF EXHIBITS

Equity Transaction Documents Relating to Issuance of Warrants for Shares of
Common Stock of ZC Sterling Corporation to ZCS Investments LLC
(excerpts)......................................................................................................................Exhibit A

### **Tabs**

Initial Term Sheet  ............................................................................................... 1

Warrant A-1 Issued by ZC to ZCS for the purchase of 1,316,544 shares
of common stock of ZC ....................................................................................... 2

Warrant A-2 issued by ZC to ZCS for the purchase of 658, 272 shares
of common stock of ZC ....................................................................................... 3

Warrant Subscription Agreement between ZCS and ZC .................................... 4

*(Tabs 5 through 10 Intentionally Omitted)*

Certificate of Formation of ZCS, dated as of August 27, 2008 ........................ 11

Operating Agreement among ZCS, Friedman, WLR AHM, WLR
GS/ Co-Invest WLR Parallel, WLR Recovery III and
WLR Recovery IV ............................................................................................. 12

Unitholders Agreement among ZCS, Friedman, WLR AHM, WLR
GS/Co-Invest WLR Parallel, WLR Recovery III and
WLR Recovery IV ............................................................................................. 13

*(Tabs 14 through 26 Intentionally Omitted)*

Servicing Agreement between ZC and AHMSI, dated as of July 1, 2008 ...................... 27

Insurance Brokerage Agreement between ZC Sterling Insurance
Agency Inc. ("ZCSIA") and AHMSI Insurance Agency, Inc. ("AHMSIA"),
dated as of August 12, 2008................................................................................ 28

Letter Agreement between ZCSIA and AHMSIA,
dated as of August 12, 2008................................................................................ 29

E-mail from Jerry Huey, AHMSI, to Jeffrey Truhan, QBE FIRST,
dated May 23, 2011, titled "Couple of Questions".............................................Exhibit B

Transcript of Proceedings re: Trial held on 12/9/2014 before Judge John G.
Koetl (Levitin - direct), *Mazzei v. The Money Store et al.*, 01-cv-5694 (JGK),
ECF 471 (S.D.N.Y.) (excerpts)...........................................................................Exhibit C

Report on QBE Financial Institution Risk Services, Inc.'s ("QBE FIRST")
Description of its Integrated Product Solution ("ZIPS System") and the
Suitability of Design and Operating Effectiveness of Controls for the Period
January 1, 2011 to October 31, 2011 ...............................................................................Exhibit D

QBE FIRST Client Lender Manual for Homeward .........................................................Exhibit E

Customer Care Inbound – Scripting – Lender Placed Policies ......................................... Exhibit F

QBE Insurance Corporation Hazard Master Policy Declarations,
dated January 1, 2010 ......................................................................................................Exhibit G

Deed of Trust, dated October 20, 2006,...........................................................................Exhibit H

Annual Escrow Analysis Statement, dated January 9, 2009................................................ Exhibit I

Renewal Policy Cover Letter for Lender Placed Hazard Insurance,
dated October 7, 2010 ....................................................................................................... Exhibit J

Deed of Trust, dated September 21, 2005........................................................................Exhibit K

Annual Escrow Analysis Statement, dated February 17, 2012.........................................Exhibit L

Flood Insurance Lender Placed Policy Cover Letter,
dated May 7, 2012............................................................................................................Exhibit M

By and through their undersigned counsel, plaintiffs Jeffrey Parker, Sandra Parker, Gerald Nungester, and Shelia Nungester ("Plaintiffs") allege the following against defendants Beltline Road Insurance Agency, Inc. f/k/a AHMSI Insurance Agency, Inc. ("Beltline"), David M. Friedman ("Friedman"), Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. ("Homeward"), QBE Financial Institution Risk Services Inc. f/k/a Sterling National Corporation f/k/a ZC Sterling Corporation ("QBE FIRST"), QBE FIRST Insurance Agency, Inc. f/k/a ZC Sterling Insurance Agency, Inc. ("QBE FIRST Insurance Agency"), QBE Insurance Corporation ("QBE Insurance Co."), QBE Specialty Insurance Company ("QBE Specialty"), WL Ross & Co., LLC ("WL Ross & Co."), WLR AHM Co-Invest, L.P., WLR/GS Master Co-investment, L.P., WLR Recovery Fund II, L.P., WLR Recovery Fund IV, L.P., and WLR IV Parallel Esc, L.P. (collectively, the "WL Ross Funds"), and ZCS Investments LLC ("ZCS Investments") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of counsel, which included, without limitation, review of public filings and statements made by Defendants, court and regulatory filings and transcripts, documents publicly disclosed pursuant to the New York Freedom of Information Law, media reports, other publicly available information, and limited pre-discovery disclosure by Defendants.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## I.     SUMMARY OF THE ACTION

1.     This is a class action lawsuit brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), and applicable state law, on

behalf of Plaintiffs and a nationwide putative class (the "Class") consisting of residential mortgagors charged for lender-placed insurance ("LPI") in connection with loans serviced by Homeward from July 1, 2008 through April 30, 2013 (the "Class Period").

2.       Mortgages require borrowers to maintain insurance to protect the lender's interest in the secured property.  If the borrower's insurance lapses, the lender is entitled to purchase LPI, and be indemnified by the borrower for the cost.

3.       Defendants perpetrated a scheme to overstate Homeward's LPI costs, and, thereby, to overcharge borrowers for indemnification.

4.       Pursuant to the scheme, Homeward's LPI carriers, QBE Insurance Co. and QBE Specialty (collectively, "QBE Insurance"), their non-insurance affiliate, QBE FIRST, and their captive insurance agency, QBE FIRST Insurance Agency (collectively, "QBE"), gave Homeward an estimated $186 million in secret premium rebates, *i.e.*, kickbacks, with respect to LPI purchased by Homeward during the Class Period.

5.       Because the mortgages only entitled Homeward to recoup "any amounts disbursed" – *i.e.*, what Homeward actually paid or expended for the LPI – Homeward was obligated to subtract the secret premium rebates, which materially reduced the "amounts disbursed," from what Plaintiffs and the Class members were charged.

6.       Defendants nevertheless fraudulently charged Plaintiffs based on the full LPI premiums without subtracting the rebates, *i.e.*, materially in excess of what Homeward actually paid or expended.  This violated the terms of the mortgages, and enabled Homeward to retain the rebates for itself.

7.       Plaintiffs were compelled to pay the overstated charges since, under the mortgages, "any amounts disbursed" for LPI became "additional debt of Borrower" secured by

2

the lender's lien.  Plaintiffs risked foreclosure if they failed to pay their monthly mortgage bills, into which the overstated LPI charges were incorporated.  Defendants intentionally exploited borrowers' fears of foreclosure to induce payment of the overstated sums, which exceeded what borrowers contractually owed.

8.     QBE provided the secret premium rebates to Homeward as a *quid pro quo* for Homeward's agreement to purchase LPI exclusively from QBE Insurance for a period of ██ years.  Under this agreement, QBE Insurance collected hundreds of millions of dollars from Homeward in LPI premiums, from which the rebates were paid.

9.     To carry out the scheme, Defendants fraudulently concealed and suppressed the material facts regarding the rebates from borrowers, regulators, and the noteholders of the mortgages that Homeward serviced.  Specifically, utilizing the mails and wires, Defendants fraudulently laundered the rebates through multiple collusive and/or sham transactions involving affiliates and related parties in order to disguise the true nature of the consideration provided to Homeward.  Those transactions included:

a.     ***An*** ██████████ ***of \$9.7 million paid under the guise of compensating Homeward for fictitious "marketing services."***  Pursuant to a letter agreement between the parties dated August 12, 2008 (the "Letter Agreement"), QBE paid Beltline, a Homeward affiliate, \$9.7 million for supposed "marketing services."  *See* Exhibit A, Tab 29, at WLR 000527.  Any such services, however, were fictitious, or, if existent, had a fair value of zero.  Instead, the \$9.7 million simply constituted a disguised premium rebate, ██████ ███████████████████████████████████████████████.  *See* Exhibit B, at Homeward 00002895.

b.        ***$135 million in warrants which were siphoned off by WL Ross***. In November 2008, ZC Sterling Corporation ("ZC Sterling") n/k/a QBE FIRST issued warrants for the purchase of ▮ million shares of its common stock to ZCS Investments, a special-purpose vehicle owned ▮ by the WL Ross Funds (Homeward's shareholders) and ▮ by Friedman (Homeward's CEO).  *See* Exhibit A, Tab 1, at WLR 000092; Exhibit A, Tab 4, at WLR 000146.  The warrants entitled the WL Ross Funds and Friedman to 15% of ZC Sterling's equity.  Barely a month later, QBE Insurance Group acquired ZC Sterling for $900 million, whereupon the WL Ross Funds and Friedman disposed of their warrants for proceeds of at least $135 million.  The warrants served no legitimate business purpose, but simply constituted secret premium rebates which WL Ross, by exercising its dominion and control over Homeward, siphoned off to the WL Ross Funds.  Friedman initially objected to the siphoning off of the rebates to the WL Ross Funds, but dropped those objections in exchange for a ▮ personal stake in ZCS Investments.

c.        ***More than $16 million in supposed "commissions" for nonexistent "brokerage" services***.  Pursuant to a supposed Insurance Brokerage Agreement between the parties dated August 12, 2008 (the "Brokerage Agreement"), QBE paid Beltline, the Homeward affiliate, so-called "commissions" equal to 15% of Homeward's LPI premiums.  *See* Exhibit A, Tab 28, at WLR 000519.  Beltline, however, was a dummy corporation which had no offices, employees, or operations, and which never actually provided any "brokerage" or other services to Homeward.  Defendants created Beltline as a pretext for the conveyance of secret premium rebates falsely denominated as "commissions."  Beltline transferred the "commissions" to Homeward through a series of secret, non-arm's length collusive transactions, thereby reducing Homeward's LPI costs.

          d.      ***More than $25 million in essentially free outsourced services***.  Pursuant to a Services Agreement between the parties dated as of July 1, 2008 (the "Services Agreement"), QBE FIRST, a loan servicing subcontractor affiliated with QBE Insurance, assumed certain of Homeward's loan servicing functions.  *See* Exhibit A, Tab 27, at WLR 000472-518.  Homeward, however, paid QBE FIRST only nominal, token consideration to perform those functions.  QBE FIRST secretly derived its actual compensation from QBE Insurance, which paid QBE FIRST a portion of Homeward's LPI premiums, *i.e.*, rebates, to fund QBE FIRST's activities.  Homeward thereby obtained essentially free outsourced services via secret premium rebates laundered through inter-affiliate QBE transfers.

      10.     Also utilizing the mails and wires, Defendants posted the overstated charges to borrowers' mortgage escrow accounts, and withdrew the overstated sums from those accounts to pay Homeward.  Defendants also issued monthly bills, annual escrow statements, and letters to Plaintiffs and the Class setting forth and/or incorporating the overstated charges while fraudulently omitting disclosure of the true costs of the LPI and the rebates.

      11.     Although this action is brought on behalf of a putative class of injured borrowers, the scheme also victimized the noteholders of the loans that Homeward serviced.  Under Homeward's agreements with noteholders (the "Mortgage Servicing Agreements"), LPI costs constituted "servicing advances" reimbursable to Homeward from loan proceeds.  To the extent borrowers defaulted, noteholders bore the overstated charges in the form of reduced loan proceeds and higher loss severities.

      12.     Notably, the affected noteholders in this case are believed to include Fannie Mae and Freddie Mac, the recipients of billions of dollars in taxpayer bailouts in the aftermath of the Financial Crisis of 2007-08.  Thus, the taxpayers ultimately paid a substantial portion of the

overstated charges alleged in this case.  In June 2014, the Office of the Inspector General (the "OIG") of the Federal Housing Finance Agency (the "FHFA") recommended that Fannie Mae and Freddie Mac sue QBE and any complicit mortgage servicers to recover such overcharges.

13.     By virtue of the acts alleged herein, Defendants violated RICO through predicate acts of mail fraud, wire fraud, "honest services" fraud, extortion, extortion attempt, extortion conspiracy, and money laundering.  Additionally, Homeward breached borrowers' mortgage loan agreements and the implied duties of good faith and fair dealing therein.  WL Ross & Co., the WL Ross Funds, and ZCS Investments (collectively, "WL Ross") are directly liable for their own violations, and vicariously liable for the violations committed by Homeward under the doctrines of piercing the corporate veil, alter-ego liability, and agency.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 18 U.S.C. § 1964(c).

15.     Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs."  Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

16.     Additionally, this Court has personal jurisdiction over Defendants because each directly and/or indirectly systematically and continually conducts business throughout the State of Florida and Texas.

17.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Florida.  Defendants are citizens

of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

18.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

19.     Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d).  Defendants regularly conduct business in this District.

## III.   PARTIES

### A.     Plaintiffs

20.     Plaintiffs Jeffrey S. Parker and Sandra L. Parker are residents of the State of Florida.  Prior to 2012, the Parkers had a mortgage loan serviced by Homeward on a property located at 3528 S. Haven Rd., Knoxville, Tennessee.  Homeward charged the Parkers at least $2,479.53 for LPI during the Class Period.  Defendants posted the charges to the Parkers' escrow account. Details of the transactions cannot be alleged with complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Defendants withdrew the sums charged from the Parkers' escrow account, thereby satisfying the charges in full.  The money was paid to Homeward.  The LPI was purchased from QBE Insurance Corporation.

21.     Plaintiffs Gerald Nungester and Shelia Nungester are residents of the State of Texas.  The Nungesters have a mortgage loan serviced by Homeward on property located at 6220 Ted Trout Drive, Lufkin, Texas.  Homeward charged the Nungesters at least $712.10 for LPI with respect to the period from at least September 2011 through April 2012.  Defendants posted the charges to the Nungesters' escrow account.  Details of the transactions cannot be alleged with complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Defendants withdrew the sums charged

from the Nungesters' escrow account, thereby satisfying the charges in full.  The money was paid to Homeward.  Homeward purchased the LPI from QBE Specialty Insurance.

22.     Plaintiffs Brennan O'Connor and Amanda O'Connor are residents of the State of Tennessee.  The O'Connors had a mortgage loan serviced by Homeward on a property located at 199 Pickard Lane, White Bluff, Tennessee.  Homeward charged the O'Connors thousands of dollars for LPI at various times during the Class Period.  Defendants posted the charges to the O'Connors' escrow account.  Details of the transactions cannot be alleged with complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Defendants withdrew the sums charged from the O'Connor's escrow account, thereby satisfying the charges in full.  The money was paid to Homeward.  The LPI was purchased from both QBE Insurance Corporation and QBE Specialty Insurance.

**B.     Defendants**

**1.     Homeward, Beltline, and Friedman**

23.     Defendant Homeward is a Delaware corporation with its principal place of business located in Coppell, Texas.  Homeward is engaged in the business of loan servicing. Homeward's loan servicing portfolio consists of in excess of 575,000 loans with an outstanding principal balance of approximately $150 billion.  In December 2012 Homeward was acquired by Ocwen Financial Corp. ("Ocwen"), a public company headquartered in Atlanta, Georgia, whose shares trade on the New York Stock Exchange.  Homeward thereby became a wholly-owned subsidiary of Ocwen.  Prior to its acquisition by Ocwen, Homeward was one of the largest independent mortgage loan servicers in the United States.  Prior to February 2012, Homeward was known as American Home Mortgage Servicing, Inc. ("AHMSI").

24.     Defendant Beltline is a Texas corporation with its purported principal place of business located in Coppell, Texas.  Beltline was at all relevant times herein known as AHMSI Insurance Agency Inc., and is a wholly-owned and direct subsidiary of Homeward.  Ocwen acquired Beltline along with Homeward in December 2012.  In February 2013, Ocwen sold Beltline to Altisource Portfolio Solutions S.A., a public company headquartered in Luxembourg whose shares trade on the NASDAQ Stock Market.  In August 2014, the SEC launched an investigation of the close relationship between Ocwen and Altisource, including the fact that William Erby, Ocwen's Chairman, owned a substantial shares of both companies.

25.     Defendant Friedman is a resident of Ormond Beach, Florida.  Friedman was President and CEO of Homeward at all times until his retirement in November 2010.  Friedman individually participated in the wrongs complained of herein.  By reason of his status as a senior executive officer of Homeward, Friedman controlled, managed and directed the affairs of Homeward, and had the power and influence to, and did, cause Homeward to engage in the unlawful conduct complained of herein.

### 2.     The WL Ross Defendants

26.     Defendant WL Ross & Co. is a Delaware limited liability fund management ompany with its principal place of business located in New York, New York.  The Chief Executive Officer of WL Ross & Co. is billionaire private equity investor and turnaround specialist Mr. Wilbur L. Ross, Jr. ("Ross").  The sole member of WL Ross & Co. is Invesco Private Capital, Inc., a Delaware corporation that is indirectly owned by Invesco Ltd., which is a publicly-owned Bermuda corporation whose shares trade on the New York Stock Exchange.  WL Ross & Co. directly or indirectly manages and controls numerous private equity funds holding $8 billion in private investments.

27.     Defendant WLR Recovery Fund III, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York.  Its investment manager is WL Ross & Co., and its general partner is WLR Recovery Associates III LLC, a Delaware limited liability company directly and indirectly controlled by Ross.

28.     Defendant WLR Recovery Fund IV, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York.  Its investment manager is WL Ross & Co., and its general partner is WLR Recovery Associates IV LLC, a Delaware limited liability company indirectly controlled by Ross.

29.     Defendant WLR AHM Co-Invest, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York. It is indirectly controlled by both WL Ross & Co. and Ross.

30.     Defendant WLR IV Parallel Esc, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York.  It is indirectly controlled by both WL Ross & Co. and Ross.

31.     Defendant WLR/GS Master Co-Investment, L.P. is a private equity fund believed to be organized as a Cayman Islands limited partnership with its principal place of business located in New York, New York.  It is indirectly controlled by both WL Ross & Co. and Ross.

32.     ZCS Investments is a Delaware limited liability company with an address in Irving, Texas.  At all relevant times, ZCS Investments was a special-purpose investment vehicle owned ███ by the WL Ross Funds, and ███ by Friedman.

33.     As alleged above, WLR Recovery Fund III, L.P., WLR Recovery Fund IV, L.P., WLR AHM Co-Invest, L.P., WLR IV Parallel Esc, L.P., and WLR/GS Master Co-Investment,

L.P. are collectively referred to herein as the "WL Ross Funds." WL Ross & Co., the WL Ross Funds, and ZCS Investments are collectively referred to herein as "WL Ross."

### 3. The QBE Defendants

34. Defendant QBE FIRST is a Delaware Corporation with its principal place of business located in Atlanta, Georgia. At all relevant times, QBE FIRST was a loan servicing subcontractor and participant in the "servicing function" of Homeward within the meaning of Item 1122 of Regulation AB, 17 C.F.R. § 229.1122. QBE FIRST is an indirect subsidiary of QBE Insurance Group, which is an Australian group holding company whose shares trade on the Australian Stock Exchange. Prior to December 2008, QBE FIRST was known as ZC Sterling. In December 2008, QBE Insurance Group acquired ZC Sterling, whereupon ZC Sterling was renamed Sterling National Corporation. In 2011, Sterling National Corporation was renamed QBE FIRST.

35. Defendant QBE FIRST Insurance Agency is a California corporation with its principal place of business located in Atlanta, Georgia. QBE FIRST Insurance Agency is a wholly-owned subsidiary of QBE FIRST. Prior to April 2011, QBE FIRST Insurance Agency was known as ZC Sterling Insurance Agency, Inc. ("ZC Sterling Insurance Agency").

36. Defendant QBE Insurance Co. is a Pennsylvania corporation with its principal place of business located in New York, New York. QBE Insurance Co. is a licensed property and casualty insurer that provides LPI to mortgage lenders and loan servicers throughout the United States. QBE Insurance Co. is an indirect subsidiary of QBE Insurance Group.

37. Defendant QBE Specialty is a North Dakota corporation with its principal place of business located in Omaha, Nebraska. QBE Specialty is a licensed property and casualty insurer that provides LPI to mortgage lenders and loan servicers throughout the United States. QBE Specialty is a direct subsidiary of QBE Insurance Co.

38.     As alleged above, QBE Insurance Co. and QBE Specialty are collectively referred to herein as "QBE Insurance."  QBE FIRST, QBE FIRST Insurance Agency, and QBE FIRST Insurance are collectively referred to herein as "QBE."

## IV.  SUBSTANTIVE ALLEGATIONS

### A.     Background

#### 1.     Lender-Placed Insurance and Mortgage Servicing Rights

39.     Mortgages require borrowers to maintain insurance to protect the lender's interest in the secured property.  If the borrower's insurance lapses, the lender is entitled to purchase LPI and be indemnified by the borrower for the cost.  Specifically, the mortgage entitles the lender to recover "any amounts disbursed" – *i.e.*, what the lender actually paid or expended for the LPI.[1] Those amounts become "additional debt of the borrower" subject to the lender's lien.

40.     Mortgage instruments are in material respects identical in this regard because they are required to conform to the standard Fannie Mae/Freddie Mac security instrument.  A standard mortgage instrument provides in pertinent part[2]:

> Property Insurance.   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. . . .  If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . .  ***Any amounts disbursed by Lender under this***

---

[1] *Black's Law Dictionary* 549 (rev'd 4th Ed. 1968) defines "disbursement" as "money paid out or expended for which one is entitled to a credit upon rendering an account of his doings."

[2] Emphasis herein is supplied unless otherwise indicated.

> *Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.*

41.     Thus, the mortgage informs the borrower that, should he or she not maintain insurance, the lender will purchase alternative coverage, and seek reimbursement for whatever it paid.  Nothing in the mortgage discloses that the lender might charge the borrower more than the lender paid, nor authorizes the lender to do so.

42.     Notably, a borrower who does not maintain his or her own insurance complies with the terms of the mortgage by repaying the lender for LPI.  The borrower is not in breach or default.

43.     Owners of mortgages sell, assign or otherwise transfer their "Mortgage Servicing Rights" or "MSRs" to specialized companies known as mortgage servicers.

44.     MSRs involve an assignment of rights and delegation of duties to the servicer. The noteholder retains the right to principal and interest (minus a small fee owed to the servicer). The servicer otherwise assumes the rights and duties of the lender.

45.     Thus, as Professor Adam Levitin of Georgetown University Law Center, an expert on MSRs, has written and testified, the servicer stands in the shoes of the lender, and is in privity with the borrower under the mortgage.  *See* Adam Levitin, *Mortgage Servicer Privity with Borrowers*, Creditslips.org (Dec. 22, 2014, 1:11 PM), available at http://www.creditslips.org/creditslips ("Mortgage Servicer Privity"); Transcript of Proceedings re: Trial held on 12/9/2014 before Judge John G. Koetl (Levitin - direct), at 119, *Mazzei v. The Money Store et al.*, No. 01 Civ. 5694 (JGK), ECF 471 (S.D.N.Y.), attached as Exhibit C ("The servicer has been assigned rights in the contract and delegated duties in the contract.  It's kind of

Contract Law 101, but once you have been delegated duties under the contract, you have stepped into the shoes of the original party to the contract.").

46.     MSRs are valuable, stand-alone assets that are frequently bought and sold separate from the mortgage loans themselves.  Pools of MSRs frequently sell for billions of dollars.

47.     MSRs necessarily include all rights and duties with respect to borrowers' escrow monies and LPI.  Regulation X defines "escrow account" as "any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan . . . ."  24 C.F.R. § 3500.17.

48.     The servicer is responsible for ensuring that the portfolio properties adequately are insured, and for advancing the servicer's own money (not that of the noteholder) for the purchase of LPI.  The servicer is also responsible for allocating borrower payments to escrow, and holding and applying escrowed funds in accordance with the mortgage and applicable law.  With respect to any amounts disbursed by the servicer for LPI, the servicer is entitled to repay itself from the borrower's escrowed funds or, if the borrower defaults, from other loan proceeds.

49.     Notably, whenever LPI is purchased, the servicer (and not the noteholder) is listed as the "Insured Mortgagee" under the policy.  Additionally, Mortgage Servicing Agreements define the servicer as an "independent contractor," not an agent of the noteholders.

50.     Mortgage Servicing Agreements allow the servicer to "outsource" their duties in whole or part to third-parties.  The servicer, however, is responsible for paying any outsource fees from its own pocket.  Unlike the costs of LPI, outsourcing fees are not "advances" reimbursable from loan proceeds under Mortgage Servicing Agreements.

### 2. WL Ross's Acquisition of AHMSI

51.     On August 6, 2007, American Home Mortgage Investment Corp. ("AHMIC"), at then the tenth largest retail mortgage lender in the United States, filed for Chapter 11 bankruptcy. AHMIC's crown jewel was the servicing platform and associated MSRs of its mortgage loan servicing unit, American Home Mortgage Servicing, Inc., a Maryland corporation ("Old-AHMSI").  AHMIC auctioned off the assets of Old-AHMSI as part of its liquidation.

52.     In or around October 2007, WL Ross submitted a stalking horse bid of $435 million to acquire the assets of Old-AHMSI from AHMIC.   The Bankruptcy Court approved the bid, and WL Ross completed the acquisition in or about November 2007.  Specifically, the WL Ross Funds acquired the assets of Old-AHMSI through a Delaware corporation called AH Mortgage Acquisition Co., Inc., which, shortly thereafter was renamed American Home Mortgage Servicing, Inc. (previously defined herein as "AHMSI").

53.     In March 2009, *Forbes* reported that WL Ross's acquisition of AHMSI was part of Ross's strategy "to become a big player in subprime mortgage servicing."

### B. AHMSI's Entry Into a ██-Year Exclusive Arrangement With ZC Sterling

54.     Prior to its acquisition by WL Ross, AHMSI had obtained its LPI from Assurant Inc. ("Assurant"), a top carrier of property-casualty insurance.   Additionally, AHMSI had outsourced certain of its servicing functions to a third-party subcontractor affiliated with Assurant.

55.     WL Ross, however, was not satisfied with AHMSI's arrangements with Assurant or the affiliated subcontractor, and, in or about the spring of 2008, caused AHMSI to issue a request for proposal to ZC Sterling, then a major competitor of Assurant and an emerging player in the United States LPI industry.

56.     ZC Sterling was highly motivated to win AHMSI's business for at least two reasons.

57.     First, at the time that it received AHMSI's proposal request, ZC Sterling was in negotiations to be acquired by QBE Insurance Group, the eighteenth largest insurance company in the world.  ZC Sterling knew that, if it were able to secure a major independent loan servicer such as AHMSI as a client, it would significantly expand ZC Sterling's book of business, enhance ZC Sterling's attractiveness as an acquisition candidate, and increase the consideration that QBE Insurance Group might be willing to pay in the contemplated acquisition.

58.     Second, AHMSI's mortgage loan portfolio, which was largely subprime, had an extremely high "penetration rate" (*i.e.*, proportion of properties subject to LPI).  AHMSI's penetration rate was approximately 12%, far above the industry norm of approximately 2-4%.  Hence, AHMSI's portfolio generated huge sums in LPI premiums relative to its size, and thus would be a very profitable client for ZC Sterling.

59.     ZC Sterling thus submitted a highly attractive proposal to AHMSI, the substantive terms of which were set forth in a four-page initial term sheet dated July 8, 2008 (the "Initial Term Sheet").  *See* Exhibit A, Tab 1, at WLR 000092-95.  In essence, in the Initial Term Sheet, ZC Sterling offered to give AHMSI millions of dollars in secret premium rebates if AHMSI would agree to purchase LPI exclusively from ZC Sterling's insurance affiliate, Empire Fire and Marine Insurance Company ("Empire"), for a period of ██ years.  *Id.*

60.     Under the proposed arrangement, Empire would collect the LPI premiums from AHMSI, then, through ZC Sterling and its affiliates, funnel a substantial portion thereof back to AHMSI in secret rebates.  ZC Sterling even agreed to provide Homeward with some of the rebates in advance, before any LPI premiums were paid, on the basis of ZC Sterling's

expectation that, over the course of the proposed ▉-year contract, AHMSI would pay hundreds of millions of dollars in LPI premiums, and that, accordingly, the deal would be immensely profitable for ZC Sterling and Empire.

61.     ZC Sterling also proposed methods to conceal and disguise the rebates. Specifically, ZC Sterling offered to launder the rebates through multiple collusive and/or sham transactions involving affiliates and related parties in order to hide the true nature of the consideration that Homeward was being provided.  That way, Defendants could pretend that no rebates existed, and could defraud borrowers by charging them based on the full LPI premiums without regard to the rebates, *i.e.*, materially in excess of the amounts actually "disbursed."

62.     To the extent borrowers defaulted, AHMSI would reimburse itself from foreclosure proceeds, thereby shifting the overstated charges to AHMSI's noteholders, who would bear the brunt of the overstated LPI advances in the form of reduced loan proceeds and higher loss severities.

63.     To be sure, the scheme would result in AHMSI's borrowers and noteholders being overcharged.  From ZC Sterling's and AHMSI's point of view, however, those victims would be none the wiser, and, regardless, had no recourse.  After all, borrowers had agreed to indemnify AHMSI for "any amounts disbursed" for the LPI, and had no right to audit AHMSI for compliance with the terms of their mortgages.

64.     As for AHMSI's noteholders, they were for the most part securitization trusts which had no motive to complain because they were mere pass-through entities and not the real parties in interest.  The real parties in interest, *i.e.*, those suffering the economic loss, were the investors in the mortgage-backed securities, or, in the case of mortgages owned or guaranteed by the GSEs, the taxpayers, neither of whom had legal standing to complain.

65.     Hoping to retain AHMSI's business, Assurant submitted a competing bid to AHMSI.  The terms offered by ZC Sterling, however, were far superior to those offered by Assurant.

66.     Accordingly, WL Ross caused AHMSI to accept ZC Sterling's proposal, and, as of July 1, 2008, AHMSI entered into a 47-page outsource agreement with ZC Sterling (previously defined as the "Services Agreement").  *See* Exhibit A, Tab 27, at WLR 000472-518.

67.     Pursuant to the Services Agreement, ZC Sterling assumed certain of AHMSI's servicing functions in exchange for a nominal outsourcing fee, as alleged more specifically below.

68.     A key term of the Services Agreement obligated AHMSI to purchase all of its LPI from Empire.  *See* Exhibit A, Tab 27, at WLR 000474, WLR 000497.

**C.      QBE Insurance Group's Acquisition of ZC Sterling**

69.     In November 2008, QBE Insurance Group announced an agreement to acquire ZC Sterling for a total purchase price of $900 million, which included $575 million in upfront cash, plus an earnout of $375 million paid over the next two years.  The transaction closed in December 2008.  Thereupon, ZC Sterling was renamed Sterling National Corporation.

70.     Despite the change in ZC Sterling's ownership and name, the Services Agreement and other arrangements with Homeward remained in force, with QBE Insurance assuming and succeeding to the rights and obligations of Empire.

71.     In 2011, Sterling National Corporation was renamed QBE FIRST.

72.     In or about February 2012, AHMSI was renamed Homeward.

**D.      The Fraudulently Concealed Premium Rebates**

73.     As alleged above, QBE agreed to funnel Homeward an estimated $186 million in secret premium rebates.  Defendants also agreed to conceal and disguise the rebates through

18

multiple collusive and/or sham transactions involving affiliates and related parties in order to camouflage their true nature.

74.     At all times, QBE derived the secret rebates from the LPI premiums that Homeward paid.  QBE accounted for the rebates as expenses or prepaid expenses which it recognized against the premium revenues that QBE received from Homeward.

75.     The secret rebate transactions included at least the following:

### 1.     The "Upfront Bonus" of $9.7 Million Paid Under the Guise of Compensating Homeward for Fictitious "Marketing Services"

76.     Pursuant to the Letter Agreement, QBE FIRST Insurance Agency (then known as ZC Sterling Insurance Agency) paid Beltline (then known as AHMSI Insurance Agency) $9.7 million for supposed "marketing services."  *See* Exhibit A, Tab 29, at WLR 000527-28; Exhibit B, at Homeward 00002895.

77.     Any such services, however, were fictitious, as implicitly admitted in a confidential email between the parties dated May 23, 2011.  According to the email, █████████ ████████████████████████████████████████████████████████████████ the Services Agreement (which, as alleged above, required that Homeward use QBE as its exclusive LPI carrier), *i.e.*, a secret premium rebate.  *See* Exhibit B, at Homeward 00002895.

78.     Sworn testimony further confirms that the "marketing services" were fictitious.

79.     In May 2012, the New York State Department of Financial Services (the "NYDFS") publicly examined representatives of Homeward and QBE as part of an investigation of the LPI industry.  Testifying on May 21, 2012, Homeward executive vice president Steven M. Massey ("Massey") admitted that Homeward never furnished any "marketing services," and that none were contemplated by the parties.  Instead, the $9.7 million payment simply was part of a lucrative "financial arrangement" offered by QBE to win Homeward's business.

80.     QBE executive Matthew Freeman ("Freeman") corroborated Massey's testimony. Testifying on May 17, 2012, Freeman likewise could not identify any "marketing services" that Homeward furnished, nor any valid business rationale for the $9.7 million payment.  Freeman admitted that he was "unaware of a similar situation to compare it to."

81.     Additionally, at all relevant times, Homeward considered its relationship with QBE to be highly confidential.  Homeward and QBE agreed to keep their arrangements secret. *See* Exhibit A, Tab 1, at WLR 000094; Exhibit A, Tab 28, at WLR 000520.

82.     Consistently, Homeward, responding to a NYDFS subpoena in 2012, designated all documents relating to its dealings with QBE as "confidential trade secrets."  Homeward and QBE also blocked disclosure of such documents to Plaintiffs' counsel under New York's Freedom of Information Law, citing such supposed secrecy.

83.     In light of the avowed secrecy relating to Homeward's relationship with QBE, it is implausible that the $9.7 million payment had anything to do with "marketing," as any such activities would have entailed disclosure of the parties' confidential relationship.

84.      *See* Exhibit A, Tab 28, at WLR 000520.

85.     Any such "cooperation" or "endorsements" however, did not constitute *bona fide* "marketing services," but were, at best, business courtesies which had a fair value of zero. Furthermore, QBE paid Beltline independent consideration for Beltline's promises under the Brokerage Agreement.

86.     At minimum, the $9.7 million so far exceeded the fair value of any supposed "marketing services" provided by Beltline under the Letter Agreement that a compelling inference is raised that the payment was a pretense for a premium rebate.

### 2.     The $135 Million in Warrants which were Siphoned Off by the WL Ross Funds

87.     In November 2008, QBE FIRST (then known as ZC Sterling) issued warrants for the purchase of ▇ million shares of its common stock to ZCS Investments, which, as alleged above, was owned ▇▇▇ by the WL Ross and ▇▇▇ by Friedman. *See* ¶¶ 9b, 31.   The warrants entitled WL Ross and Friedman to a 15% of equity stake in QBE FIRST.

88.     Barely a month later, in December 2008, QBE Insurance Group completed the acquisition of ZC Sterling for $900 million, which included $575 million in upfront cash plus an earnout of $375 million paid over the next two years.

89.     The WL Ross Funds and Friedman disposed of their warrants in the acquisition for proceeds of at least $135 million.

90.     The warrants served no legitimate business purpose, but simply constituted secret premium rebates which WL Ross, by virtue of its dominion and control over Homeward (as alleged more specifically below in ¶¶ 174-198), siphoned off to the WL Ross Funds in the form of warrants.

91.     The consideration paid in the form of the warrants to ZCS Investments properly belonged to Homeward as the payer of the LPI premiums.   Indeed, the parties identified the warrants in the documentation for the transaction as "the American Home Warrants."

92.     Furthermore, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ *See* Exhibit A, Tab 1, at WLR 000092. ████████

████████████████████████████████████████████████████

███████████████████████████████████████. *See id*.; Exhibit A, Tab

4, at WLR 000146; Exhibit A, Tab 12, at 000296-97.  Therefore, were it not for the fact that WL

Ross exercised its control over Homeward to siphon off the rebates to the WL Ross Funds, the

consideration represented by the warrants would have gone to Homeward.

93.    In exchange for the warrants and other premium rebates, WL Ross agreed to, and

did, cause Homeward to execute the Services Agreement (which, as alleged above, required that

Homeward purchase all of its LPI from QBE Insurance).  *See* Exhibit A, Tab 1, at WLR 000092-

95; Exhibit A, Tab 13, at WLR 000298.

94.    Friedman, Homeward's CEO, initially objected to WL Ross's siphoning off of the

secret rebates to the WL Ross Funds in the form of warrants.  However, Friedman dropped those

objections in exchange for WL Ross's agreement to give Friedman a ██████ personal ownership

stake in ZCS Investments.

95.    Thereafter, Friedman retired, enriched by his share of the warrants.

96.    Notably, all parties to the warrants transaction kept its existence secret until May

2012, when, under cross-examination by the NYDFS, representatives of QBE and Homeward

were forced publicly to admit the relevant facts.

97.    WL Ross struck the bargain to receive the warrants because WL Ross learned in

the course of its negotiations with ZC Sterling that ZC Sterling simultaneously was in

negotiations with QBE Insurance Group with respect to a potential acquisition of ZC Sterling.

WL Ross knew that if ZC Sterling were able to secure Homeward as a client, and the contemplated acquisition by QBE Insurance Group occurred, the warrants would be worth large sums of money.  *See* Exhibit A, Tab 1, at WLR 000092.  WL Ross thus seized upon the opportunity to siphon off valuable premium rebates in the form of the warrants.

### 3.    The More Than $16 Million in Supposed "Commissions" for Nonexistent "Brokerage" Services

98.    Pursuant to the Brokerage Agreement, QBE FIRST Insurance Agency paid Beltline so-called "commissions" equal to 15% of Homeward's LPI premiums, totaling more than $16 million.  *See* Exhibit A, Tab 28, at WLR 000519.

99.    The "commissions" ostensibly compensated Beltline for "brokerage" services. Letters issued by Defendants to Plaintiffs and the Class claimed that Homeward's LPI was "obtained with the assistance" of Beltline.   *See* Exhibit J; Exhibit M.

100.    Beltline, however, was not a *bona fide* "broker," but simply was a dummy corporation which was wholly-owned and controlled by Homeward, Beltline's corporate parent. Specifically, Homeward formed Beltline for the sole purpose of laundering secret premium rebates from QBE falsely denominated as "commissions."

101.    Beltline's existence was limited to a set of incorporation documents and a series of book-keeping entries maintained and managed by Homeward.  Beltline had no website, offices, employees, management, or operations independent of Homeward.  Beltline employed no individuals who were licensed insurance brokers or otherwise.  There is not a single person on Linkedin.com who lists employment at AHMSI Insurance Agency, Inc. (Beltline's name during the Class Period) under their experience.

102.    Beltline never "brokered" any insurance products, provided Homeward with any "assistance" in "obtaining" LPI, or engaged in any activities whatsoever apart from, if anything,

carrying on the affairs of its parent, Homeward. Any ostensible business operations of Beltline were conducted by full-time employees of Homeward acting in their capacities as full-time employees of Homeward. Accordingly, Beltline furnished no services or other consideration in exchange for the "commissions" that it received.

103.    A compelling inference that Beltline did not "assist" Homeward in "obtaining" LPI or provide Homeward with any "brokerage" services, contrary to Defendants' claims, is bolstered by a series of factors, including, *inter alia*, that:

a.    No brokerage agreement between Beltline and its ostensible client, Homeward, existed. Typically, insurance brokers enter into agreements with their clients authorizing the broker to act on behalf of the client, setting forth the precise terms of the arrangement, and the compensation to which the broker is entitled. Here, Homeward and Beltline did not even bother with the pretense of creating a brokerage agreement. Beltline simply contracted with QBE FIRST Insurance Agency, QBE Insurance's agent, to receive payments falsely denominated as "commissions."

b.    Beltline never executed certifications of compliance with servicing criteria or delivered compliance audits in accordance with Item 1122 of Regulation AB. Such certifications and audits were required of all third parties "participating in the servicing function" of Homeward. *See* 17 CFR 229.1122. Notably, QBE FIRST, which actually was a third party participating in the servicing function of Homeward, executed such certifications and delivered such audits annually. *See* Exhibit A, Tab 27, WLR 00518. Beltline did not do so because it was not a third party and did not participate in Homeward's servicing function, with respect to LPI or otherwise.

          c.      QBE FIRST's compliance audits confirm that QBE FIRST and its subsidiary QBE FIRST Insurance Agency performed all steps necessary to secure Homeward's LPI without any assistance from Beltline or any other party.  As the audit reports summarize:



*See* Exhibit D, at Homeward 00003240.  Hence, QBE FIRST performed all relevant functions with respect to Homeward's LPI.  Beltline had no role.

          d.      QBE FIRST's Client Lender Manual for Homeward, which lays out the process followed by QBE FIRST and QBE FIRST Insurance Agency for securing Homeward's LPI, does not mention Beltline.  *See* Exhibit E, at Homeward 00000097 - 00000211.  Had Beltline actually "assisted" in "obtaining" the LPI, Beltline's role would have been described in the Client Lender Manual which otherwise is exhaustive and highly detailed; and,

          e.      Homeward did not conduct any Vendor Management Audits of Beltline.  Homeward routinely audited all third party vendors and contractors to assure that their activities complied with Homeward's requirements.  Homeward did not conduct any Vendor Management Audits of Beltline because Beltline was not a third party and had no activities.

104.    At minimum, the "commission" payments to Beltline so far exceeded the fair value of any services provided by Beltline under the Brokerage Agreement that a compelling inference is raised that those payments constituted a pretense for premium rebates.

105.    Beltline upstreamed the "commissions" to Homeward, thereby reducing Homeward's LPI costs.  Specifically, Beltline paid Homeward the money under the guise of compensating Homeward for the purported use of its "office space" and for providing Beltline with supposed "administrative services."  The "office space" and "administrative services" transfers, however, constituted non-arm's length, collusive transactions which simply served to launder the premium rebates.

106.    Specifically, Beltline's supposed obligation to pay Homeward for "office space" arose under a collusive and fraudulent "Office Services Agreement."  Having no employees or operations apart from Homeward, Beltline did not occupy any separate "office space."

107.    Highlighting the collusiveness of the purported "Office Services Agreement," Friedman signed the instrument on behalf of both parties – Homeward and Beltline. Furthermore, the agreement provided that any formal notices to be issued by either party thereunder, Homeward or Beltline, were to be sent to the same corporate officer – an employee of Homeward who absurdly would have issued any notices to himself.

108.    Beltline's supposed obligation to pay Homeward for "administrative services" arose under a similarly collusive and fraudulent "Administrative Services Agreement."  The "Administrative Services Agreement" likewise was executed on behalf of both Homeward and Beltline by the same corporate officer, namely, Friedman.  The agreement was a sham because Beltline had no operations or functions (apart from laundering premium rebates) to "administer."

109.    Beltline also passed "commissions" to Homeward in the form of dividends.

### 4. The More Than $25 Million in Essentially Free Outsourced Mortgage Servicing Services

110.    Pursuant to the Services Agreement, QBE FIRST assumed certain of Homeward's loan servicing functions.  *See* ¶¶ 9d, 68-71; Exhibit A, Tabs 27-29, at WLR 000498-528. Homeward, however, paid QBE FIRST only nominal, token consideration to perform these functions – specifically, $0.08 per loan, per month, an amount that was substantially below QBE FIRST's costs.

111.    QBE FIRST derived its actual compensation from QBE Insurance, which paid QBE FIRST a portion of Homeward's LPI premiums, *i.e.*, rebates, to fund QBE FIRST's activities.  Homeward thereby essentially paid outsource fees using secret premium rebates laundered through inter-affiliate QBE transfers.

112.    It is estimated that the services delivered to Homeward under the Services Agreement had a fair value that exceeded the token consideration paid by at least $25 million, raising a compelling inference that those services constituted laundered premium rebates.

113.    These financial arrangements are confirmed by sworn testimony.  On May 17, 2012, QBE executive Matthew Freeman admitted in sworn testimony to the NYDFS that QBE Insurance routinely compensated QBE FIRST for delivering free or below-cost, outsourced loan servicing services to QBE Insurance clients such as Homeward.  In fact, as Freeman conceded, "QBE Insurance's principal expenses are the compensation it pays QBE FIRST and the payment of claims under the policies it writes."

114.    Notably, the outsourced services had virtually nothing to do with LPI.  QBE FIRST *inter alia*:

a. ████████████████████████████████

████████████████████████████████

27

██████████████████████████████████████████████████

████████████████████████████ *See* Exhibit A, Tab 27, at WLR 000498-508;

b.   ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ *id.*,

c.   ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████; *id.*, and,

d.   ██████████████████████████████████████████████

████████████████████████. *Id.*

115.   QBE FIRST performed these labor-intensive functions in large operations centers staffed by hundreds of employees who processed tens of thousands of tax and insurance documents and payments on behalf of Homeward per month.

116.   The activities of QBE FIRST under the Services Agreement constituted "servicing function[s]" within the meaning of Item 1122 of Regulation AB.  QBE FIRST was a "third-party contractor" "participating in the servicing function" of Homeward thereunder. Reflecting QBE FIRST's status as a third-party contractor participating in Homeward's "servicing function," ███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████. *See* Exhibit A, Tab 27, at WLR 000518; Exhibit D at Homeward 00003233-3325.

### E.     The Fraudulent and Deceptive Nature of the Scheme

117.    By virtue of the conduct alleged herein, Defendants fraudulently overstated Homeward's LPI costs, and thereby overcharged Plaintiffs in violation of their mortgages.  The mortgages only entitled Homeward to recover "any amounts disbursed" – *i.e.*, what Homeward actually paid or expended for the LPI.  Thus, Homeward was obligated to subtract the secret premium rebates, which materially reduced the "amounts disbursed," from what Plaintiffs and the Class members were charged.  Unbeknownst to Plaintiffs and the Class, however, Defendants fraudulently charged Plaintiffs based on the full LPI premiums without subtracting the rebates, or even disclosing the existence of the rebates.

118.    Homeward, as the servicer, stood in the shoes, and assumed the rights and duties, of the lender under the mortgages.  Homeward advanced its own monies for the purchase of LPI, named itself as the "Insured Mortgagee" under the LPI policies, escrowed Plaintiffs' funds, and applied those funds to repay itself for the ostensible costs of the LPI.  By engaging in these acts, Homeward invoked, stood upon, and asserted its rights under the mortgages.  Homeward thereby adopted the promises and representations made in the mortgages, *i.e.*, that the maximum that Plaintiffs and the Class would be charged for LPI was "any amounts disbursed."  *See* ¶¶ 38-39, 116.

119.    Plaintiffs and the Class had a reasonable expectation that Homeward was complying with the mortgages and the law, and that any LPI charges were valid, authorized, in the ordinary course of business, and truly reflected the "amounts disbursed" for the LPI.

120.    Furthermore, Plaintiffs and the Class had a reasonable expectation that Homeward was not receiving undisclosed rebates.  Uniformly, state insurance laws prohibit premium rebates. *See, e.g.*, Tenn. Code Ann. § 56-8-104(8) (barring insurers from giving "rebate of premiums" or other "valuable consideration or inducements" to policyholders); Tex. Ins. Code § 543.003

(same).  Plaintiffs and the Class were entitled to assume that QBE Insurance obeyed those laws, or, at minimum, that if any rebates were paid, they were being subtracted from the amounts that borrowers were being charged in accordance with the mortgages.

121.    Had Plaintiffs been aware of the rebates and overcharges, Plaintiffs would have objected to the charges, alerted authorities that Defendants were violating the mortgages and committing fraud, and/or sued, as they are now.  The undisclosed nature of the rebates and overcharges made it impossible for Plaintiffs to take any of these steps.

122.    Utilizing the mails and wires, Defendants fraudulently:

a.    Concealed the rebates by laundering them through multiple collusive and/or sham transactions in order to disguise the true nature of the consideration received by Homeward, as alleged above, *see* ¶¶ 9, 72-115;

b.    Posted the overstated charges to borrowers' mortgage escrow accounts, and withdrew the overstated sums from those accounts to pay Homeward.  Specifically, with Homeward's authority under the Services Agreement, QBE FIRST affected and implemented such overcharge transactions via an electronic interface with Homeward's servicing system.

c.    Issued monthly bills, annual escrow statements, and letters to borrowers setting forth and/or incorporating the overstated charges, while omitting disclosure of the true costs of the LPI and the rebates.

123.    For example, on October 7, 2010, QBE FIRST issued a letter to the Parkers on Homeward letterhead claiming that Homeward had "advanced" $826.51 for the "premium cost" and was entitled to be "repa[id]" that amount.  *See* Exhibit J.  "At your expense, we have purchased a renewal insurance policy to protect our interest in the property.  The ***premium cost*** of this insurance is shown on the attached policy declaration.  You are solely responsible for the

*repayment of this cost*," the letter said.  Additionally, the letter stated "You will be required to *repay* the amount shown on the enclosed policy."

124.   Defendants issued materially identical letters to all Class members.

125.   The letters were materially false and misleading, and omitted material information. By virtue of the secret rebates, the LPI had "cost" Homeward materially less than indicated, the sums necessary to "repay" Homeward were overstated, and the amounts "advanced" were less than claimed.  Moreover, Plaintiffs and the Class were not "responsible" for the full charges because they were only obligated to repay "any amounts disbursed," which the sums indicated in the letters exceeded.

126.   The letters also falsely claimed that the LPI was "obtained with the assistance" of Beltline.  In fact, however, as alleged above, Beltline was a dummy corporation with no operations which had no part whatsoever in obtaining the LPI for Homeward.  *See* ¶¶ 9c, 97-108. Instead, QBE FIRST secured Homeward's LPI without any assistance from Beltline or any other party.  Beltline existed solely to collect premium rebates falsely denominated as "commissions," which Beltline then transferred to Homeward through a series of secret non-arm's length, collusive transactions, thereby reducing Homeward's LPI costs.  *See* ¶¶ 9c, 104.

127.   For another example, on January 9, 2009, Homeward issued an Annual Escrow Analysis Statement (the "Escrow Statement") to the Parkers incorporating the overstated LPI charges.  *See* Exhibit I.  Specifically, the Escrow Statement indicated a charge of $826.51 for "HAZARD INS.", *i.e.*, for LPI from QBE.  The Escrow Statement claimed that "[d]eposits into your escrow account are built into your monthly mortgage payments and those sums are held in reserve for future *disbursements* for your property taxes and/or insurance."

128.   Homeward issued materially similar Escrow Statements to all Class members.

129.    The Escrow Statements were materially false and misleading, and omitted material information, by incorporating the overstated charges without disclosing the rebates.  By virtue of the rebates, the "HAZARD INS." charges exceeded what Homeward actually "disbursed" for the LPI.

130.    Defendants also lied and omitted material information to borrowers who telephoned Homeward about the LPI charges.  ███████████████████████████████ ███████████████████████████████████████████ *See* Exhibit F, at Homeward 00002530.  In fact, however, because of the rebates, the amounts billed exceeded what Homeward "paid" to obtain the LPI.

131.    Defendants intended to conceal the fraud and to mislead Plaintiffs and Class members, thereby making it less likely that Plaintiffs or Class members would object to the overstated charges, complain to authorities, or bring lawsuits.   Defendants crafted their communications to Plaintiffs to foster the appearance that the LPI charges were properly calculated and owed.  Defendants intentionally lulled borrowers into a false sense of security that the transactions were in the ordinary course of business, and that nothing was amiss.

132.    As alleged above, this action is brought on behalf of a putative class of defrauded borrowers.  Defendants' scheme, however, also victimized the noteholders of the mortgages that Homeward serviced.   Under the Mortgage Servicing Agreements, LPI costs constituted "servicing advances" reimbursable to Homeward from loan proceeds.  To the extent borrowers defaulted, the noteholders bore the overstated charges in the form of reduced loan proceeds and higher loss severities.

133.    Notably, the affected noteholders in this case are believed to include Fannie Mae and Freddie Mac, the recipients of billions of dollars in taxpayer bailouts in the aftermath of the

Financial Crisis of 2007-08.  Thus, the taxpayers ultimately paid a substantial portion of the overstated charges alleged in this case.  In June 2014, the OIG of the FHFA recommended that Fannie Mae and Freddie Mac sue QBE and any mortgage servicers complicit in the overcharging scheme.

134.    By virtue of the conduct alleged herein, Homeward overstated its "servicing advances," thereby defrauding noteholders.  Utilizing the mails and wires, Homeward issued remittance and servicing reports to noteholders fraudulently incorporating the overstated advances.

135.    QBE FIRST and Homeward also delivered false certifications of compliance with servicing criteria to the noteholders.  As alleged above, by virtue of the Services Agreement, Homeward essentially paid outsource fees using secret premium rebates laundered through inter-affiliate QBE transfers.  *See* ¶¶ 109-115.  This violated the Mortgage Servicing Agreements, which required Homeward to pay any outsource fees out of pocket, not from loan proceeds that otherwise would be remitted to noteholders.  The certifications fraudulently omitted the material facts regarding these violations of the applicable servicing criteria.

136.    Defendants intended to conceal the fraud and to thereby mislead and defraud the noteholders clients.  Defendants crafted the remittance and servicing reports and certifications of compliance issued to the noteholders to foster the appearance that Homeward's supposed LPI "advances" were properly calculated in compliance with the Servicing Agreements.  Defendants intended to lull noteholders into a false sense of security that the transactions were in the ordinary course of business, and that nothing was amiss.  Defendants sought to make it less likely that noteholders would object to the overstated advances, complain to authorities, or bring lawsuits.

### F.     The Extortionate Nature of the Scheme

137.    No mechanism exists for borrowers to select servicers that do not engage in secret collusive arrangements with their LPI insurers or their affiliates.  All mortgage loan agreements provide in words or substance that:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

138.    Accordingly, borrowers have no say in the selection of servicer, and cannot opt-out with respect to the secret rebates or collusive transactions described herein.

139.    Additionally, once a borrower experiences a lapse in their homeowners insurance, they have no choice but to pay whatever LPI charges are imposed, even if, as here, those charges fraudulently are overstated.  The servicer simply withdraws whatever amount is claimed for LPI from the borrower's escrow account, which is funded through monthly payments.  Due to the threat and fear of foreclosure, borrowers are compelled to make their monthly payments – and, hence, to pay any LPI charges incorporated into their monthly bills.  Furthermore, borrowers have no right to audit their servicers' underlying transactions and, thus, no ability to discover whether their servicer is overstating the amounts disbursed for LPI.

140.    Defendants intentionally exploited Plaintiffs' and the Class members' fears of foreclosure to induce payment of the overstated amounts charged for LPI.  Homeward had no claim of right to the sums demanded because those amounts exceeded the "amounts disbursed," and, to that extent, were not owed by Plaintiffs and the Class under the mortgages.

### G.     The Absence From this Lawsuit of Any Challenge to the Filed Rates

141.    Nothing herein challenges or should be construed as challenging the reasonableness of any insurance rates filed with or approved by any state insurance regulators. Plaintiffs stipulate that all filed and approved insurance rates were reasonable.

142.     Nor does anything herein allege that QBE's payment of rebates in itself harmed Plaintiffs.  Plaintiffs favor rebates, discounts and cost savings whenever possible.

143.     Instead, the gravamen of this lawsuit is that, Homeward's having received rebates, Defendants had no right to charge Plaintiffs and the Class based on the full premiums inasmuch as the mortgages, which were the only instruments by which any payment obligation on the part of Plaintiffs and the Class arose, only entitled Homeward to recoup "any amounts disbursed" – *i.e.*, what Homeward actually paid or expended for the LPI.  Nothing in the mortgages incorporated or referred to the filed rates, let alone authorized Homeward to compute the additional debt owed under Plaintiffs' loans based on the filed rates irrespective of what Homeward actually "disbursed."  Furthermore, nothing in the mortgages entitled Defendants to defraud borrowers by overstating Homeward's true LPI costs while concealing the rebates, or to exploit borrowers' fears of foreclosure to induce payment of the overstated, extra-contractual sums.

144.    Furthermore, the rebate agreements in question, including the Term Sheet, the Letter Agreement, the Services Agreement, the Brokerage Agreement, and the Warrants Subscription Agreement, were side agreements. None of those agreements was filed with or approved by any state insurance agency.

145.    Moreover, Homeward was the sole "customer" of QBE Insurance, *i.e.*, the carrier, and the sole "policyholder" of the LPI.  *See* ¶ 53-67, 76, 92.  As such, Homeward solely was obligated to pay the "premiums" under the policies.

146.     Plaintiffs and Class, by comparison, were not "customers" of QBE Insurance, and did not pay "premiums."  Instead, Plaintiffs and the Class were mortgagees who paid "additional debt" due under their mortgages.  *See* ¶¶ 7, 38-39 ("Any amounts disbursed by Lender under this Section 5 shall become ***additional debt of Borrower*** . . . . ***and shall be payable . . . upon notice from Lender to Borrower requesting payment***.").

147.     As Homeward admits, Homeward purchased the coverage for ***its own*** benefit and sought reimbursement from Plaintiffs and the Class through their loan payments.  *See* Exhibit F, at Homeward 0002530 (explaining to Class members that "***AHMSI has obtained coverage to protect its interest in your mortgaged property.  AHMSI has billed you for what it paid to obtain this coverage***.").

## V.     THE NEW YORK STATE INVESTIGATION OF THE LPI INDUSTRY

### A.     Superintendent Lawsky Launches an Investigation

148.     On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the NYDFS ("Superintendent Lawsky"), launched a probe of improper practices in the LPI industry.

149.     On April 5, 2012, Superintendent Lawsky issued a press release announcing that the NYDFS had expanded its LPI probe and was scheduling public hearings on the matter to take place in May 2012.

150.     The press release stated that the NYDFS's investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates.  .  .  .  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business."  The press release referred to the fact that LPI overcharges harm not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

36

**B.**     **QBE and Homeward Admit to the Essential Facts Regarding the Premium Rebates**

151.     In May 2012, the NYDFS held three days of hearings. As alleged above, executives of Homeward (then known as AHMSI) and QBE testified.  Specifically, Massey testified on behalf of Homeward, and Freeman testified on behalf of QBE.  Massey and Freeman admitted to the essential facts regarding the premium rebates and overcharges alleged herein.

152.     Testifying on May 21, 2012, Massey admitted that, in August 2008, Homeward (then known as AHMSI) had awarded the multi-year contract to QBE (then known as ZC Sterling) because of the superior package of "financial arrangements," *i.e.*, secret premium rebates, that QBE had offered compared to its competitor, Assurant.  Massey acknowledged that those "arrangements" included the $9.7 million supposed "marketing support payment," the warrants to WL Ross, the $16 million in bogus "insurance commissions," and the below-cost services.

153.     Specifically, Massey admitted that Homeward never provided QBE with any "marketing services" or intended to.  As Massey acknowledged, the $9.7 million simply constituted part of the lucrative "financial arrangement" offered by QBE to win Homeward's business.  Massey also admitted that Beltline collected the "commissions" from QBE and then transferred them to Homeward, purportedly to compensate Homeward for the ostensible use of its "office space."

154.     Massey also admitted that QBE FIRST only charged Homeward the artificially low cost of $0.08 per loan, per month, for the outsourced services, notwithstanding that those services were "expensive."  "It's a very arduous process to . . . keep tabs on all these loans and the process, checking, auditing, funding.  It is an expensive endeavor," Massey stated.

155.    Asked by the commissioners how Homeward (then known as AHMSI) secured such remunerative terms from QBE (then known as ZC Sterling), Massey testified that he believed that, at the time, *i.e.*, in July 2008, ZC Sterling considered AHMSI to be "a fairly significant client" and "would have liked to expand in the business.  And I think they recognize that having us as a client would help them," *i.e.*, in ZC Sterling's negotiations to be acquired by QBE Insurance Group.

156.    Testifying on May 17, 2012, QBE's Freeman similarly admitted to the $9.7 million supposed "marketing" payment and the $16 million in ostensible "commissions." Freeman also conceded that QBE Insurance funneled money to QBE FIRST to "compensate" it for the outsourced services provided to Homeward.  "QBE Insurance's principal expenses are the compensation it pays QBE FIRST and the payment of claims under the policies it writes," Freeman stated.

### C.    QBE Pays New York $10 Million to Settle LPI-Related Claims

157.    On April 17, 2013, QBE entered into a Consent Order with the NYSDFS in connection with its LPI activities in the State.  The NYDFS found that QBE's kickback arrangements with mortgage servicers, including Homeward, violated New York Insurance Law § 2324, which prohibits carriers from providing "any rebate from the premium" or "any valuable consideration or inducement of any kind" to insurance customers.  QBE agreed to pay $10 million in penalties and to implement a set of "major reforms" relating to its practices.  QBE pledged, subject to certain conditions, to stop: (i) paying purported "insurance commissions" to the affiliates of loan servicers; (ii) providing "free or below-cost, outsourced services to banks, servicers or their affiliates;" and (iii) "making payments" to servicers or their affiliates "in connection with securing business."

158.   New York Governor Andrew Cuomo lauded the consent order, stating that "kickbacks and payoffs in the force-placed insurance industry used to be a dirty little secret . . . , but my Administration's investigation is helping put a stop to those abuses."

## VI.   FANNIE MAE UNSUCCESSFULLY ATTEMPTS TO PUT AN END TO THE OVERCHARGES

159.   Fannie Mae is the largest single owner and guarantor of mortgage loans in the United States.  Fannie Mae has contracted with more than 1,400 mortgage loan servicers across the United States to service tens of millions of mortgage loans on Fannie Mae's behalf.  At all relevant times, Homeward was an approved servicer for Fannie Mae in good standing.  Homeward's servicing portfolio is believed to have included a large percentage of Fannie Mae loans.

### A.   Fannie Mae Seeks Independent, Kickback-Free Bids for LPI and Loan Servicing Outsource Services

160.   On March 6, 2012, Fannie Mae issued a request for proposal (the "RFP") seeking to completely revamp the LPI procurement process.  "Much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner," the RFP stated.  "This RFP is designed to change this situation."

161.   Specifically, the RFP requested that insurers submit independent and not combined bids for LPI and loan servicing outsource services.  Approved applicants were to be put on lists of "Preferred Providers" from which servicers of Fannie Mae loans would be required to choose.

162.   According to the RFP, Fannie Mae had conducted a "review" from which it had learned that LPI insurers paid "commissions/fees to Servicers for placing business with them"

and, further, that such "commissions/fees" were "recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae."

163.    Fannie Mae additionally stated that it had discovered that "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services."

164.    The RFP proposed a "new business model," one that would eliminate such secret rebates.  Fannie Mae explained that the objective of the RFP was to eliminate the "existing system" of secret rebates involving "subsidized" loans servicing services and related-party "commissions."  The RFP stated:

> As a best practice Fannie Mae seeks to reduce expenses while improving service quality.  After extensive internal review, Fannie Mae believes that current Lender Placed Insurance costs are not market competitive and can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners. Therefore, Fannie Mae is undertaking this competitive procurement process to improve the pricing and fee transparency for Lender Placed Insurance while maintaining coverage and service quality.

> **Current Situation**

> Fannie Mae's current Lender Placed Insurance situation is as follows:

> 1.    Homeowners are required to maintain voluntary hazard insurance on Fannie Mae insured properties.

> 2.    Lender Placed Insurance must be acquired by mortgage Servicers when a property is no longer eligible for Voluntary Insurance, or when the Servicer cannot obtain proof of adequate Voluntary Insurance from the homeowner, irrespective of whether or not that homeowner is current or delinquent on the loan.

> 3.    The cost of Lender Placed Insurance is higher than the cost of voluntary hazard insurance. Homeowners are billed for the Lender Placed Insurance premiums. ***However, if the homeowner does not pay the premium (for example, if the property has already been vacated), then Servicers pass on the premium costs to Fannie Mae.***

4.   *Servicers are responsible for providing tracking services, per Fannie Mae Guidelines.  Many large Servicers have chosen to outsource the Insurance Tracking and associated administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.*

5.   *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6.   The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae.  . . . . *In addition, Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums* . . . .

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets.  *However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation.*

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1.   Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae.

2.   Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees.

3.   Separate the commissions and fees for Insurance Tracking services from the fees for Lender Placed Insurance to ensure transparency and accountability.

4.   Require Servicers to order Lender Placed Insurance policies based on competitive pricing negotiated by Fannie Mae; Fannie Mae will choose one or more Providers based on the responses received during the RFP process. The chosen Providers will be placed on a Preferred Provider List.

41

5. Restructure the business model to align Servicer incentives with the best interests of Fannie Mae and homeowners.

6. Enforce best practices that encourage the use of voluntary insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a period of years. However, Fannie Mae is prepared to restructure the current Lender Placed Insurance business model to operate as a market driven service that efficiently meets the best interests of Fannie Mae, its partner insurers, taxpayers, and homeowners.

***Fannie Mae is confident that the business model proposed herein is fair to all parties, allows market-based pricing, eliminates subsidies, and allows Fannie Mae to best meet its federal charter to facilitate home ownership, provide liquidity to the housing market, and protect taxpayers.*** Fannie Mae also believes that this new model is sustainable over time and robust enough to adjust to changing conditions as the housing market recovers. The attributes of the new business model will be as follows:

1. The premiums to be charged for Lender Placed Insurance will be negotiated between Fannie Mae and the Lender Placed Insurer(s). These premiums will be communicated to Fannie Mae's Servicer community.

2. The Lender Placed Insurer(s) will continue to invoice the Servicers for insurance provided. Fannie Mae will then reimburse the Servicers, but will not pay more than the rate negotiated by Fannie Mae. ***The rate negotiated between Fannie Mae and the Lender Placed Insurer(s) will exclude any commissions paid by the Lender Placed Insurer(s) to Fannie Mae Servicers to place their insurance on Fannie Mae properties. In addition the rate will exclude the cost of providing Insurance Tracking services or any other costs beyond the cost of the policy premium to the Servicer***.

3. Servicers may contract for Insurance Tracking and associated administrative services from a Lender Placed Insurer on the Preferred Provider List, perform tracking services in-house, or outsource tracking to a Provider not on the list since the Servicer is fully liable for tracking costs. ***However, the full cost of such services must be billed independent of, and never embedded in, the insurance premiums charged for Lender Placed Insurance. Fannie Mae will not reimburse Servicers for these tracking and administrative services***.

(Emphasis added).

42

165.    By virtue of the RFP, Fannie Mae hoped to "lower costs for homeowners, taxpayers, and Fannie Mae."

**B.    The LPI Industry, Led by QBE, Lobbies the FHFA to "Spike" the Fannie Mae RFP**

166.    Multiple bidders, including, reportedly, QBE and Assurant, responded to the Fannie Mae RFP.  An analysis of the bids leaked to *American Banker* in late 2012 indicated that Fannie Mae stood to save approximately 29% off its LPI costs, or $145 million annually based on the bids.

167.    In September 2012, Fannie Mae asked the FHFA, Fannie Mae's conservator, to sign off on the new procurement plan.

168.    The FHFA, however, refused.

169.    The LPI industry stood to lose tremendous profits as a result of the Fannie Mae RFP, which would have barred the lucrative kickbacks that had become the industry's lifeblood.  Thus, loan servicers and LPI insurers (including QBE), even as they responded to the RFP, had mounted an aggressive, behind-the-scenes lobbying campaign to pressure the FHFA into vetoing the Fannie Mae initiative.

170.    The lobbying succeeded.  On February 10, 2013, to the surprise of Fannie Mae staffers, the FHFA informed Fannie Mae that it was not approving the RFP, according to accounts by *American Banker*, which covered these developments in a series of investigative reports.

171.    The following day, the FHFA held a private conference call with the Mortgage Bankers Association and other trade groups to inform them of the decision.  The industry participants were extremely pleased.  Defeating the Fannie Mae plan, thereby enabling the exploitative status quo to continue, had been a top business priority.  Victory was now achieved.

43

172.    Immediately after the call and before the FHFA publicly released any information, the stock price of Assurant, one of the largest LPI carriers in the United States, surged by 6.7%.

173.    As summarized by American Banker, the FHFA "buckled under pressure from insurers and bankers" and "spiked" the Fannie Mae plan, thus allowing the system of secret rebates to continue at a cost of hundreds of millions of dollars a year to homeowners and mortgage investors.  *See* Jeff Horwitz, "Big Banks Win, Taxpayers Lose as Fannie Insurance Overhaul Spiked," *American Banker*, Feb. 25, 2013.

174.    *Reuters* columnist Felix Salmon ("Salmon") issued a column criticizing the FHFA's action.  *See* Felix Salmon, *It's time to abolish the FHFA*, Reuters.com (Feb. 26, 2013), available at http://www.reuters.com.  Salmon stated that the FHFA's stance on the Fannie Mae RFP had proven that it was "captured" by banking interests which were "extracting rents" from homeowners, mortgage investors and taxpayers.  Salmon argued that the FHFA was "useless," "obstructive," "counterproductive," and should be "abolished."  As Salmon wrote:

> *Fannie has seen at least $150 million of savings evaporate – and homeowners are going to wind up overpaying even more, for insurance their servicers have chosen for them*.
>
> *       *       *
>
> *I've heard of regulators being captured by the organizations they're supposed to be regulating – that happens all too frequently. But the situation at the FHFA seems to be even worse: it looks as though it has been captured by the banks which are extracting rents from the regulated organizations*.
>
> Indeed, it's hard to think of a single good reason why the FHFA should exist at all. . . .  The FHFA has been *useless* and *obstructive* pretty much from day one, and this latest decision only serves to underscore how *counterproductive* it's being.

**C.    The OIG of the FHFA Recommends that Fannie Mae Consider Suing QBE**

175.    On June 25, 2014, the OIG of the FHFA issued a report recommending that Fannie Mae and Freddie Mac consider suing QBE and other actors in the LPI industry for

overcharges.  By the OIG's calculations, Fannie Mae and Freddie Mac suffered an estimated $158 million in financial harm from improperly overstated LPI charges in 2012 alone.

## VII.   WL ROSS'S DOMINATION AND CONTROL OF HOMEWARD

176.   At all relevant times, WL Ross dominated and controlled the affairs of its portfolio company, Homeward, such that the circumstances justify piercing Homeward's corporate veil and holding WL Ross legally responsible for Homeward's unlawful conduct.  WL Ross operated Homeward as a mere instrumentality, alter-ego, and agent of WL Ross, and exercised and wielded its dominion and control over Homeward to cause Homeward to engage in the specific unlawful acts alleged in this complaint, thereby abusing Homeward's corporate form to perpetrate an injustice against Plaintiffs and the Class.

177.   In an interview with the *Wall Street Journal* in February 2009, Ross acknowledged that "[t]he whole idea of private equity is *to exercise control*."  The notion that private equity firms "should be passive investors doesn't strike me as sensible," Ross said.  Similarly, in a January 6, 2009 interview with *CNNMoney*, Ross stated, "Private equity *is not passive.  We are not minority investors.  We are control investors.  That is the whole theory of private equity – adding value through better management.*"

178.   Consistent with Ross's philosophy, WL Ross's limited partnership agreements and private placement memoranda with its investors emphasized that WL Ross was actively involved in the management, control, and day-to-day operation of the companies in which WL Ross invested.

179.   Also consistent with this philosophy, WL Ross managed and exercised complete, direct control over Homeward and its day-to-day operations at all times during the Class Period.  On April 26, 2009, the *Wall Street Journal* accurately reported that Homeward was "*controlled by* Mr. Ross."

45

180.    WL Ross appointed a majority, if not all, members of Homeward's board of directors, and appointed and named individuals associated with and/or hand-picked by WL Ross to key management, executive, and operational roles at Homeward.  At all times, WL Ross and its affiliates and agents were immersed in the details of the management and day-to-day operation of Homeward.  WL Ross held frequent meetings with senior executives to discuss operations, and had access to all of Homeward's books, records, and computer systems.

181.    Like other private equity firms, WL Ross routinely entered into contracts with its portfolio companies to charge them ongoing advisory and management fees.  WL Ross and/or its affiliates had such contracts with Homeward.  Pursuant thereto, WL Ross and/or its affiliates and agents charged Homeward hundreds of thousands of dollars a month in advisory and management fees.  WL Ross and those affiliates and agents earned every nickel of such enormous sums in fees by actually managing and controlling all material aspects of Homeward's business and day-to-day operations, including, without limitation, Homeward's secret rebate arrangements with QBE, the fraudulent overcharges imposed on borrowers and noteholders, and the fraudulent communications and transactions alleged above.

182.    Indeed, because of the huge sums of money that Homeward received in secret rebates, *i.e.*, an estimated $186 million, those aspects of Homeward's business and operations were critical to Homeward's profitability and financial results, and, hence, demanded the attention of WL Ross.

183.    Furthermore, in the summer of 2008, WL Ross directly participated in the negotiations over and the consummation of the arrangements with QBE (then known as ZC Sterling), as evidenced by the fact that those arrangements included the warrants transaction,

whereby WL Ross's siphoned off secret premium rebates which were worth at least $135 million that otherwise would have gone to Homeward, as alleged above.  *See* ¶¶ 86-96.

184.  WL Ross's direct participation in the negotiations over and consummation of the arrangements is evidenced by the fact that WL Ross's regular counsel, Weil Gotshal & Manges LLP, represented both WL Ross and Homeward in the subject transactions.  Weil Gotshal prepared a closing binder titled ████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ which included all of the documentation for the secret rebate transactions, *i.e.*, the Initial Term Sheet, the Services Agreement, the Brokerage Agreement, the Letter Agreement, and the Warrant Subscription Agreement.  *See* Exhibit A.

185.  Moreover, the Initial Term Sheet made clear that all aspects of the arrangements were linked. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████. *See* Exhibit A, Tab 1, at WLR 000092-95.

186.  Under its agreements with Homeward, WL Ross possessed and exercised authority over, *inter alia*, Homeward's budgets, business plans, capital expenditures, dispositions of assets, distributions of equity, incentive plans, performance targets, incurrence of debt, selection of auditors, decisions with respect to litigation and regulatory matters, and the hiring

and firing of key personnel.  WL Ross also possessed and exercised authority over Homeward's business practices and procedures with respect to LPI.

187.    In addition, WL Ross controlled whether Homeward would enter into material contracts, including specifically, any contracts with LPI vendors and loan servicing subcontractors.  This is indicated by the fact that, as alleged above, WL Ross caused Homeward to enter into the Services Agreement requiring Homeward to purchase all of its LPI from QBE Insurance.  ¶¶ 53-67, 76, 92.  Specifically, WL Ross agreed to cause Homeward to enter into the Services Agreement in exchange for the secret premium rebates, including, as alleged above, the warrants which were worth at least $135 million.

188.    WL Ross also had the authority to merge or sell Homeward or its assets, as indicated by the fact that, on December 27, 2012, WL Ross sold Homeward to Ocwen.

189.    Accordingly, at all relevant times, WL Ross had complete control over Homeward and all aspects of Homeward's business and day-to-day operations.

190.    WL Ross's control is also illustrated by WL Ross's public participation in Homeward's affairs, and admitted intimate knowledge of and involvement in Homeward's operations. In his public utterances, Ross routinely referred to WL Ross and Homeward collectively as "we," thus affirming that, in his view and in reality, Homeward was WL Ross's alter ego.

191.    For example, in April 2008, Homeward (then known as AHMSI) acquired the MSRs of Option One Mortgage Corporation ("Option One"), a subsidiary of H&R Block, in a transaction that significantly expanded AHMSI's loan servicing portfolio.  WL Ross was intimately involved with and exercised complete control over all aspects of that transaction. H&R Block's March 17, 2008 press release announcing the transaction did not even mention

AHMSI.  It simply stated that H&R Block had signed a definitive agreement to sell Option One to "an entity sponsored by WL Ross & Co. LLC. (the 'Buyer'), a private equity firm."  The release also indicated that the "Buyer" in the transaction was represented by WL Ross's regular counsel Weil Gotshal.

192.    Additionally, in or about February 2009, Homeward (then known as AHMSI) acquired the MSRs of Citi Residential Lending, the mortgage servicing unit of Citigroup, for $1.5 billion.  WL Ross was intimately involved with and exercised complete control over all aspects of that transaction as well.  Ross personally broke the news of the acquisition on *CNBC's Squawkbox* program on February 5, 2009.  Ross also informed *National Mortgage News* of the transaction's specifics – for example, that the average loan size of the acquired portfolio was about $200,000, and that the aggregate unpaid principal balance of the acquired portfolio was about $37 billion.  Ross also explained the rationale for the transaction to *National Mortgage News*, stating that "*[w]e* feel that there are substantial economies of scale from adding a large block of mortgages to our existing platform, and we believe that our team has developed an excellent record in making modifications and dealing with REO."

193.    Ross also publicly discussed the WL Ross/Homeward agenda to acquire additional servicing rights.  "*We* make no bones about the fact that we are in the market for servicing," Ross stated.  "*We* really think we have the best team in the business at American Home," Ross also said, referring to the individuals associated with and/or hand-picked by WL Ross that were named to key management, executive, and operational roles at Homeward.

194.    On November 14, 2008, WL Ross and Homeward (then known as AHMSI) jointly issued a statement in response to the Streamlined Mortgage Modification Plan ("SMP") introduced by the FHFA.  "*We* strongly support this new program. . . .  For loans that do not

meet the SMP eligibility criteria, AHMSI will continue to use its industry-leading and proactive home preservation approach," the statement declared.  Further, "*we* strongly encourage our investors and the investor trade groups to support the use of the SMP, as enhanced with a net present value floor feature, for securitizations not covered by the SMP," the statement said.

195.   Two days later, on November 16, 2010, Homeward (then known as AHMSI) issued a press release announcing the hiring of David M. Applegate ("Applegate") as Homeward's new CEO and President.  The release featured a statement by Ross that "Dave's depth and breadth of experience in the mortgage and banking industries and his commitment to customers are major assets that will further strengthen the management team after a period of strong growth in AHMSI's business."  As the release strongly suggested, WL Ross, and Ross in particular, actively managed and controlled the selection of Applegate, a key Homeward executive.

196.   For its own profit, WL Ross was motivated to, and did, cause Homeward to engage in the specific unlawful acts alleged in this complaint, thereby abusing Homeward's corporate form to perpetrate an injustice against Plaintiffs and the Class.

197.   WL Ross profited from and was enriched by the secret premium rebates alleged herein directly and indirectly.  As alleged above, the WL Ross Funds received at least $135 million in proceeds from the warrants upon the sale of ZC Sterling to QBE Insurance Group.  *See* ¶¶ 86-96, 181, 185.

198.   WL Ross also profited from the increased profitability that Homeward derived from the other premium rebates.  As alleged above, on December 27, 2012, WL Ross sold Homeward to Ocwen for approximately $750 million, which was $315 million more than WL Ross had paid for Homeward in the AHMIC liquidation in 2008.  A material part or all of the

profit that WL Ross realized on the sale of Homeward resulted from the premium rebates, which increased Homeward's profitability and value.

199.    WL Ross also reaped substantial management fees from Homeward and dividends from its ownership of Homeward stock and preferred stock.

200.    By virtue of its dominion and control over Homeward, and its exercise thereof to cause Homeward to engage in the specific acts complained of in this lawsuit, WL Ross is liable for the violations committed by Homeward under principles of piercing the corporate veil, alter-ego liability, and agency.

## VIII.   THE TOLLING OF THE STATUTES OF LIMITATIONS

201.    The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming from the concealment by Defendants of the facts alleged herein, and equitable tolling, stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged herein.  Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged.  At all relevant times, Defendants maintained a shroud of secrecy around their illicit dealings.  Indeed, at all relevant times, Homeward deemed its dealings with QBE to constitute a "confidential trade secret," and has sought to block the public disclosure of documents pertaining to those dealings under New York State's Freedom of Information Law.  Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this action. Plaintiffs had no means of learning the facts underlying the claims alleged herein because they were not entitled to audit Homeward's transactions.  Thus, they could not have discovered the secret premium rebates alleged herein or the resulting overstated LPI charges.

202.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on Homeward to fulfill its contractual duties under the mortgage loan contracts of Plaintiffs and the Class in good faith and in an honest manner, and to similarly execute its duties under the Mortgage Servicing Agreements with Homeward's noteholders in good faith and in an honest manner.   Even assuming there had been some indication of wrongdoing (and there was none), and Plaintiffs and the Class had attempted to investigate, such investigation would have been futile because it would not have been possible until recently to uncover any specific information as to Defendants' involvement in the unlawful scheme alleged herein.

203.    Due to the complex, undisclosed, and self-concealing nature of the scheme alleged herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise, to discover the misconduct alleged.   Plaintiffs only were able to discover the underlying basis for their claims with the assistance of counsel.

204.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis.   Nevertheless, the news coverage generally related to improper foreclosure practices.   It was not until January 2012 that any major national news outlets began publishing any reports about secret premium rebates relating to the referral of LPI business.

205.    The first time *The New York Times* published a news article about such rebates was on January 10, 2012.   *The New York Times* broke the story that Superintendent Lawsky of the NYDFS was investigating several large banks in connection with improper practices relating to LPI, including "kickbacks."   *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

206.    Prior to such time, there was insufficient coverage of allegations of secret premium rebates relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants' misconduct.   Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry," and which previously published articles on LPI) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." *See* "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

207.    Further, even had Plaintiffs or the Class been on inquiry notice of misconduct relating to LPI in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that Homeward, WL Ross, Friedman or QBE was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged above, Massey testified to the pertinent transactions at the NYDFS LPI hearings.   Prior to May 21, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking Homeward, WL Ross, Friedman and QBE to potential secret premium rebates relating to LPI on loans serviced by Homeward.   Prior to such time, Plaintiffs and the Class did not have an adequate factual basis to plead the claims alleged herein.

208.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations alleged herein until, at the earliest, May 21, 2012.   Furthermore, any delay by Plaintiffs and the Class in asserting the claims herein is excusable because they could not

reasonably have discovered the misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## IX.  CLASS ACTION ALLEGATIONS

209.  Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> all residential mortgage loan borrowers whose loans were serviced by Homeward and from whose escrow accounts funds were withdrawn to pay for LPI at any time from July 1, 2008 through April 30, 2013 (the "Class").

210.  The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors, and assigns.

211.  The Class is so numerous that joinder of all members is impracticable.

212.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

213.  Plaintiffs' claims are typical of the claims of the Class.

214.  There are questions of law and fact common to the Class, including but not limited to:

a.  Whether Defendants devised and carried out a scheme to defraud borrowers by overcharging them for LPI reimbursement;

b.  Whether the scheme alleged herein constitutes mail or wire fraud, attempt to commit mail or wire fraud, or conspiracy to commit mail or wire fraud;

c.  Whether the scheme alleged herein constitutes extortion, attempted extortion, or extortion conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951(a);

d.  Whether the scheme alleged herein constitutes money laundering in violation of 18 U.S.C. §1956(a)(1);

e.     Whether the scheme alleged herein constitutes a violation of RESPA, 12 U.S.C. §2607(a);

f.     Whether Homeward breached borrowers' mortgage loan agreements and violated the covenants of good faith and fair dealing implied therein;

g.     Whether Homeward operated as an alter-ego or agent of WL Ross and whether Homeward's corporate veil should be pierced; and

h.     Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages.

215.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

216.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class.

217.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

218.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

219.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

220.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
**(Against All Defendants)**

221.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

222.    Plaintiffs, each Class member, and each defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

**The Enterprise**

223.    The RICO "enterprise" was an association-in-fact Enterprise, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants including their respective officers, directors, employees, agents, and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

224.    The Enterprise was managed and organized by Defendants.   Each of the Defendants agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

225.    The Defendants that constituted the Enterprise were associated for the common purpose of defrauding and extorting borrowers and defrauding noteholders of Homeward by charging them overstated amounts for reimbursement of LPI with respect to Homeward-serviced loans.  The purpose thereof was to collect overstated sums in respect of such indemnification charges.  The proceeds of the Enterprise were distributed to Defendants.

226.    The Defendants that constituted the Enterprise were responsible for and carried out separate roles in pursuit of the common purpose of the Enterprise.

227.    Homeward *inter alia*: (i) contracted with QBE FIRST for below-cost loan-serving outsource services; (ii) purchased LPI from QBE FIRST's affiliate, QBE Insurance; (iii) created Beltline as a dummy corporation to collect millions of dollars in bogus "commissions"; (iv) collected $9.7 million under the Letter Agreement from QBE for fictitious "marketing" services; (v) issued monthly bills, annual escrow statements, and letters to Plaintiffs and the Class overstating Homeward's LPI premium costs and omitting disclosure of the secret rebates; (vi) authorized QBE FIRST to post the overstated charges to borrowers' mortgage escrow accounts, and to withdraw the overstated sums from those accounts to pay Homeward; (vii) recouped the overstated sums from loan payments and escrow accounts of Plaintiffs and the Class, as well as from loan proceeds which otherwise would have been paid to the noteholders; (viii) designated ZCS Investments to receive secret rebates in the form of warrants which otherwise would have been paid to Homeward; (ix) issued remittance and servicing reports to noteholders fraudulently incorporating the overstated advances, and also issued false certifications of compliance with servicing criteria to the noteholders; and (x) received secret premium rebates in the form of the $9.7 million "marketing" payment, the bogus "commissions," and below-cost loan-servicing outsourced services from QBE FIRST and QBE FIRST Insurance Agency.

57

228.     QBE FIRST and QBE FIRST Insurance Agency *inter alia*: (i) contracted to and did provide Homeward with below-cost loan-servicing outsourced services; (ii) received inter-affiliate transfers of monies derived from Homeward's LPI premiums, *i.e.*, premium rebates, from QBE Insurance, to fund their activities on behalf of Homeward; (iii) used the premium rebates received from QBE Insurance to pay Homeward $9.7 million under the Letter Agreement, to issue warrants to WL Ross and Friedman, to render services to Homeward under the Services Agreement; (iv) issued letters to Plaintiffs and the Class in Homeward's name overstating Homeward's LPI premium expenses and omitting disclosure of the secret rebates; (v) issued certifications of compliance to Homeward's servicing clients falsely attesting that Homeward and QBE FIRST were in compliance with the Mortgage Servicing Agreements; and (vi) posted the overstated charges to borrowers' mortgage escrow accounts, and withdrew the overstated sums from those accounts to pay Homeward via an electronic interface with Homeward's servicing system; and (vii) paid secret rebates to WL Ross in the form of warrants.

229.     QBE Insurance *inter alia* funneled secret premium rebate to Homeward via inter-affiliate transfers to QBE FIRST and QBE FIRST Insurance Agency to pay the "commissions" for nonexistent "brokerage" services and the $9.7 million payment for fictitious "marketing" services.

230.     Beltline *inter alia*: (i) collected premium rebates from QBE Insurance in the form of bogus "commissions" and transferred those "commissions" to Homeward under the guise of compensating Homeward for the purported use of its "office space" and/or to pay Homeward supposed "administrative services."

231.     WL Ross *inter alia*:  (i) exercised its dominion and control over Homeward to cause Homeward to enter into the Services Agreement and other arrangements with QBE; (ii)

caused Homeward to engage in the specific unlawful acts alleged in this complaint, and (iii) demanded and received the warrants and/or their proceeds from ZC Sterling as a *quid pro quo* for the foregoing.

232.    ZCS Investments *inter alia*: (i) received the warrants; (ii) exercised the warrants and thereby received proceeds of at least $135 million on the sale of ZC Sterling to QBE Insurance Group; and (iii) distributed those proceeds to the WL Ross Funds and Friedman;

233.    Friedman *inter alia*: (i) as a senior executive officer of Homeward, controlled, managed and directed the affairs of Homeward, and had the power and influence to, and did, cause Homeward to engage in the unlawful conduct complained of herein; (ii) dropped his objections to the siphoning off of the rebates to the WL Ross Funds in exchange for a ███ personal stake in ZCS Investments; (iii) received a share of the warrants and/or their proceeds for his personal benefit; and (iv) created and served as the sole manager of ZCS Investments; (v) as manager of ZCS Investments, affected the exercise of the warrants in the QBE Insurance Group acquisition, and affected the distribution of the proceeds of the warrants to the WL Ross Funds and Friedman.

234.    The Enterprise operated from at least July 2008 through April 2013.    The longevity of the Enterprise was sufficient to permit the Defendants to pursue the Enterprise's common purpose.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged.

235.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

## The Pattern of Racketeering Activity

236.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.  Defendants conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.      Defendants perpetrated a scheme to overstate Homeward's LPI premium expenses, and, thereby, to recoup overstated amounts from borrowers in indemnification under their mortgages;

b.      Homeward, a loan servicer, entered into exclusive loan-servicing outsource contract with QBE (then known as ZC Sterling), *i.e.*, the Services Agreement.  A key term of the Services Agreement obligated Homeward (then known as AHMSI) to use LPI insurers affiliated with QBE, namely Empire and its successor QBE Insurance.  In exchange, QBE agreed to pay Homeward millions of dollars in secret premium rebates;

c.      Defendants disguised and camouflaged the premium rebates through multiple sham and/or collusive transactions involving affiliates and related parties, including, as alleged above:  (i) $9.7 million paid under the Letter Agreement for fictitious "marketing" services; (ii) the $135 million in warrants siphoned off by WL Ross  and Friedman, (iii) the more than $16 million in "commissions" for nonexistent "brokerage" services; and (iv) the approximately $25 million in below-cost loan-servicing outsourced service provided by QBE FIRST and QBE FIRST Insurance Agency;

d.      Homeward had no right under the mortgages to recoup in excess of "any amounts disbursed" for the LPI.  Accordingly, Defendants should have subtracted the premium

rebates from the amounts that borrowers were billed.  Instead, however, Defendants pretended that the rebates did not exist, and fraudulently billed borrowers based on the full premiums. This violated the terms of the mortgages, and enabled Homeward to keep the rebates for itself;

e.      Throughout the Class Period, Defendants posted the overstated charges to borrowers' mortgage escrow accounts, and withdrew the overstated sums from those accounts to pay Homeward;

f.      Defendants also issued monthly bills, annual escrow statements, and letters to Plaintiffs and the Class setting forth and/or incorporating the overstated charges, while fraudulently omitting disclosure of the true costs of the LPI and the rebates;

g.      To the extent borrowers defaulted, Defendants shifted the overstated LPI costs to the noteholders, who incurred those expenses in the form of reduced loan proceeds and higher loss severities; and,

h.      Defendants issued mail and wire communications to the servicing clients, including periodic remittance reports, servicing reports, and certifications of compliance with servicing criteria which overstated Homeward's LPI "advances" while omitting disclosure of the rebates.

### The Predicate Acts of Mail and Wire Fraud

237.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and noteholders of Homeward and to obtain money or property from said borrowers and noteholders through false or fraudulent pretenses, representations and promises.

238.    The conduct of Defendants in violation of the mail and wire fraud statutes included, without limitation, a fraudulent scheme to deprive borrowers and noteholders of their intangible rights to Homeward's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.  Homeward, as servicer, was an assignee of the original lenders, stepped into the shoes of those lenders, and owed contractual obligations to borrowers to bill and credit their accounts in accordance with the mortgage terms.  Those terms imposed a duty on Homeward not to charge borrowers in excess of "any amounts disbursed" for LPI.  By virtue of the conduct alleged herein, Homeward breached that contractual obligation.  Homeward also breached a duty owed to the noteholders under the Mortgage Servicing Agreements not to overstate Homeward's "servicing advances," and to pay any outsource fees from Homeward's own pocket.  Homeward was obligated to execute its contractual duties in an honest manner.

239.    Nevertheless, Homeward misused its position as servicer to extract bribes and kickbacks from QBE at the expense of borrowers and noteholders.  Homeward thereby breached its obligations to render those victims "honest services."  Each of the Defendants intentionally and willfully conspired and participated in Homeward's "honest services" violations.  Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

240.    The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants in furtherance of the scheme, constituted predicate acts of mail and/or wire fraud.

241.    It was reasonably foreseeable to Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

242.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions.  The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants.  Nevertheless, Plaintiffs allege such transmissions generally.

243.    For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.  For example:

a.     QBE FIRST and QBE FIRST Insurance Agency issued letters containing overstated LPI charges to borrowers via mail;

b.     Homeward issued monthly statements and bills containing overstated LPI charges to borrowers via mail and/or electronically via wire;

c.     With Homeward's authority under the Services Agreement, QBE FIRST and QBE FIRST Insurance Agency posted the overstated charges to borrowers' mortgage escrow accounts, and withdrew the overstated sums from those accounts to pay Homeward via mail or wire;

d.     Homeward issued remittance and servicing reports containing overstated LPI charges to servicing clients via the mail and/or electronically via wire;

e.     Homeward paid QBE LPI premiums via wire;

f.     Borrowers made their mortgage loan payments, which included the overstated LPI charges, via mail and/or wire;

g.      QBE Insurance funneled money derived from Homeward's LPI premiums to QBE FIRST and QBE FIRST Insurance Agency by mail and/or wire;

h.      QBE paid Beltline purported "commissions" via mail and/or wire; and,

i.      Beltline transferred the "commissions" to Homeward by mail or wire.

244.    Each electronic and/or postal transmission was incident to an essential part of the scheme.   As detailed above, Defendants engaged in similar activities with respect to each member of the Class and with respect to each of Homeward's noteholders.

245.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and noteholders.

246.    Defendants each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers and noteholders into paying and/or incurring falsely overstated, unauthorized charges in connection with LPI.

247.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).   The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and servicing clients to pay and incur the falsely overstated, unauthorized charges with respect to LPI and thereby enable Defendants to reap illicit profits.

248.    Defendants were common participants in the predicate acts.   Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and servicing clients.

### The Predicate Acts of Extortion, Attempted Extortion
### and Conspiracy to Commit Extortion

249.     Defendants' pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

250.     As alleged above, no mechanism exists for borrowers to select servicers that do not engage in secret collusive arrangements with their LPI insurers or their affiliates. Accordingly, borrowers have no say in the selection of servicer, and cannot opt-out with respect to the secret rebates or collusive transactions described herein.

251.     Additionally, once a borrower experiences a lapse in their homeowners insurance, they have no choice but to pay whatever LPI charges are imposed, even if, as here, those charges fraudulently are overstated.  The servicer simply withdraws whatever amount is claimed for LPI from the borrower's escrow account, which is funded through monthly payments.  Due to the threat and fear of foreclosure, borrowers are compelled to make their monthly payments – and, hence, to pay any LPI charges incorporated into their monthly bills.  Furthermore, borrowers have no right to audit their servicers' underlying transactions and, thus, no ability to discover whether their servicer is overstating the amounts disbursed for LPI.

252.     Defendants intentionally exploited Plaintiffs' and the Class members' fears of foreclosure to induce payment of the overstated amounts charged for LPI.  Homeward had no claim of right to the sums demanded because those amounts exceeded the "amounts disbursed," and, to that extent, were not owed by Plaintiffs and the Class under the mortgages.

253.     At all relevant times, by virtue of the conduct alleged above, Defendants induced, and attempted and conspired to induce, Plaintiffs and the Class to pay extra-contractual sums, not lawfully owed under their mortgage loan agreements, through the wrongful use of actual or threatened fear of economic harm.  Specifically, Defendants used, and attempted and conspired

to use, the actual or threatened fear of foreclosure to induce Plaintiffs and the Class to pay the improper charges.

254.    As alleged above, borrowers' mortgage instruments provided that the expense of any LPI premiums "shall become additional debt of Borrower secured by this Security Instrument . . . ," and that the lender or its authorized servicer was entitled to foreclose to collect any amounts that were unpaid.

255.    Defendants issued notices to borrowers explicitly warning that the LPI charges were "your responsibility."  Defendants also added those charges to borrowers' monthly bills.

256.    Mortgage loan servicers routinely collect unpaid LPI charges by foreclosing. Based on his investigation, Superintendent Lawsky found that LPI charges frequently "push distressed homeowners over the foreclosure cliff."

257.    By virtue of the facts alleged above, Plaintiffs and the Class reasonably believed: (i) that Defendants possessed the power to collect any unpaid LPI charges through foreclosure; and (ii) that Defendants would exploit that power and foreclose if borrowers failed to pay the LPI charges.

258.    Additionally, by virtue of the facts alleged above, Defendants agreed to engage in the acts alleged above, and intentionally performed acts, including, without limitation, the acts alleged above, that, under the circumstances as Defendants believed them to be, constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation, in that, *inter alia*, they exploited the fears of economic loss of Plaintiffs and the Class to obtain money to which Defendants were not legally entitled.  Moreover, Defendants thereby affected and intended to affect interstate commerce.

66

259.    Plaintiffs and the Class received nothing of value in exchange for payment of the excess LPI charges.

### The Predicate Acts of Money Laundering

260.    The pattern of racketeering activity also consisted of money laundering in violation of 18 U.S.C. §1956(a)(1).  Pursuant to 18 U.S.C. §1956(a)(1), money laundering is defined, in pertinent part, as follows:

> whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

261.    Defendants disguised and camouflaged the proceeds of their mail fraud, wire fraud, and Hobbs Act violations alleged above through a series of transactions designed to conceal the nature, location, source and ownership of such proceeds.  These transactions included the multiple sham transactions, alleged above, to conceal the premium rebates from borrowers, noteholders, and regulators.  Specifically, as alleged in detail above, Defendants:

a.      disguised the $9.7 million in premium rebates as a supposed "marketing services" fee;

b.      disguised and concealed $135 million in premium rebates by paying them in warrants rather than cash, and to third-parties, WL Ross and Friedman;

c.      Disguised and concealed the more than $16 million in premium rebates by funneling them through a third-party, Beltline, and fraudulently denominating them as "insurance commissions;" and,

d.      disguised and concealed an estimated $25 million in premium rebates by paying them in the form of below-cost loan-servicing outsource services under a purportedly independent and arms' length contract, *i.e.*, the Services Agreement.

262.    Defendants intentionally engaged in, and benefitted from, the money laundering activities described herein.  Defendants conducted such transactions knowing and intending that they were designed to promote and conceal the proceeds of their mail fraud, wire fraud, and Hobbs Act violations.

### Continuity

263.    The predicate acts alleged herein extended over the course of more than four years, were part of Defendants' regular way of doing business, and related to each other in that they had the same or similar purposes, results, participants, types of victims (*i.e.*, Homeward's borrowers and noteholders), methods of commission, or were otherwise related by distinguishing characteristics, and were not isolated events.

### Injury to Plaintiffs and the Class

264.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).   Plaintiffs and the Class paid overstated, contractually unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

265.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

266.    WL Ross is liable for the RICO violations committed by Homeward under principles of piercing the corporate veil, alter-ego liability, and agency.

**COUNT II**
**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

267.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

268.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

269.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

270.    As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

271.    As also set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

272.    Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and servicing clients with respect to LPI.   The purpose thereof was to induce borrowers and servicing clients to pay or incur fraudulently overstated, unauthorized charges with respect to LPI.

273.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

274.    As set forth in Count I, above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

275.     Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

276.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

277.     As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently overstated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

278.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

279.     WL Ross is liable for the RICO conspiracy violations committed by Homeward under principles of piercing the corporate veil, alter-ego liability, and agency.

**COUNT III**
**VIOLATION OF RESPA, 12 U.S.C. § 2607(a)**
**(Against All Defendants)**

280.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

281.     Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

282.     Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

283.     Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

284.     HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan."  24 C.F.R. § 3500.2(b).

285.     Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance."  24 C.F.R. § 3500.2(b)(11).

286.     The provision of LPI constitutes a "settlement service" under RESPA.  At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

287.     QBE unlawfully gave, and Homeward and WL Ross unlawfully received, "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business.  As alleged above, the kickbacks consisted of $10 million in cash, warrants worth $85 million, $16 million in phony "insurance commission," and approximately $25 million in below-cost loan servicing outsource services.

71

288.     Such consideration constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to QBE.  These practices violated RESPA, 12 U.S.C. § 2607(a).

289.     Plaintiffs and the Class were actually harmed by Defendants' unlawful scheme.

290.     Defendants therefore violated Section 8(a) of RESPA.  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid with respect to LPI.

291.     In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs seek attorneys' fees and costs of suit on behalf of themselves and the Class.

292.     WL Ross is liable for the RESPA violations committed by Homeward under principles of piercing the corporate veil and agency.

**COUNT IV**
**BREACH OF CONTRACT**
**(Against Homeward and WL Ross)**

293.     Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

294.     At all relevant times, Homeward, as the servicer and owner of the MSRs of the mortgages, stood in the shoes and assumed the rights and duties of the lender under the mortgages, and was in privity with Plaintiffs and the Class under the mortgages.  Homeward advanced its own monies for the purchase of LPI, named itself as the "Insured Mortgagee" under the LPI policies, escrowed Plaintiffs' funds, and applied those funds to repay itself for the ostensible costs of the LPI.  Homeward also issued monthly statements and bills to borrowers in its own name, demanding that borrowers make their payments to Homeward.  Additionally, Homeward routinely filed foreclosure complaints in its own name, identifying itself as the lawful "mortgagee" entitled to the borrowers' payments, to foreclose, and to the proceeds of foreclosure.

295.   By engaging in these acts, Homeward invoked, stood upon, and asserted its rights under the mortgages, and was thereby subject to the terms thereof.  Those terms limited what Homeward was entitled to charge Plaintiffs and the Class for LPI to "any amounts disbursed."

296.   Homeward breached the mortgage instruments of Plaintiffs and the Class by charging them in excess of the "amounts disbursed" for LPI.  Homeward thereby recouped overstated sums from borrowers' loan payments and escrow accounts.

297.   As a direct, proximate, and legal result of Homeward's breach of contract, Plaintiffs and the Class have suffered damages.

298.   WL Ross is liable for Homeward's breaches of contract under principles of piercing the corporate veil, alter-ego liability, and agency.

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Homeward and WL Ross)

299.   Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

300.   Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

301.   Pursuant to the implied covenant of good faith and fair dealing, Homeward was obligated to perform its duties and exercise its rights under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

302.   Homeward breached its duty of good faith and fair dealing by overstating its LPI premium expense, omitting disclosure of the premium rebates that is received, and recouping overstated sums from borrowers in LPI reimbursement.  Homeward dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

303.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

304.    WL Ross is liable for Homeward's breaches of the covenant of good faith and fair dealing under principles of piercing the corporate veil, alter-ego liability, and agency.

**COUNT VI**
**COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT**
**(Against Homeward, WL Ross and Friedman)**

305.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

306.    Plaintiffs and the Class conferred a substantial benefit on Homeward, WL Ross and Friedman based by paying overstated charges with respect to LPI, from which Homeward, WL Ross, and Friedman received premium rebates.   These benefits came at the expense of Plaintiffs and the Class.

307.    The circumstances are such that in equity and good conscience restitution should be made by Homeward, WL Ross and Friedman to Plaintiffs and the Class.

308.    As a result of Homeward's, WL Ross's and Friedman's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.  Plaintiffs and the Class seek full disgorgement and restitution of Homeward's, WL Ross's, and Friedman's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

309.    Plaintiffs and the Class are entitled to restitution and/or disgorgement of premium rebates and profits realized by Homeward, WL Ross and Friedman as a result of their unfair, unlawful and/or deceptive practices.

310.     WL Ross is directly liable for its own unjust enrichment.  Additionally, WL Ross is liable for Homeward's unjust enrichment under principles of piercing the corporate veil, alter-ego liability and agency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.     An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

B.     An order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

C.     Judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' practices, along with exemplary damages to each Class member for each violation;

D.     Judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the excess charges imposed on Plaintiffs and the Class;

E.     Restitution of an amount equal to all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

F.     Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

G.     An order awarding Plaintiffs and the Class their attorneys' fees and costs; and

H.      Such other and further relief as may appear necessary and appropriate.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the

claims alleged herein.

Dated:  March 8, 2016                                Respectfully Submitted,

                                                              */s/Adam M. Schachter*
                                                              ADAM M. SCHACHTER
                                                              Florida Bar No. 647101
                                                              aschachter@gsgpa.com
                                                              DAN S. GELBER
                                                              Florida Bar No. 512877
                                                              dan@gsgpa.com
                                                              JARRED L. REILING
                                                              Florida Bar No. 93930
                                                              jreiling@gsgpa.com
                                                              GELBER SCHACHTER & GREENBERG, P.A.
                                                              1221 Brickell Avenue, Suite 2010
                                                              Miami, Florida 33131-3224
                                                              Tel: (305) 728-0950
                                                              Fax: (305) 728-0951
                                                              efilings@gsgpa.com

                                                              *Liaison Counsel for Plaintiffs*

                                                              *and*

                                                              MARK A. STRAUSS (*pro hac vice*)
                                                              mstrauss@kmllp.com
                                                              THOMAS W. ELROD (*pro hac vice*)
                                                              telrod@kmllp.com
                                                              KIRBY McINERNEY, LLP
                                                              825 Third Avenue, 16th Floor
                                                              New York, New York 10022
                                                              Tel: (212) 371-6600
                                                              Fax: (212) 751-2540

                                                              *Attorneys for Plaintiffs*

## SERVICE LIST

FELIX J. LOPEZ, ESQ.
flopez@dlclegal.com
DiBELLO & LOPEZ, P.A.
1550 Madruga Avenue, Suite 504
Coral Gables, Florida 33146
Telephone: (305) 668-8870
Facsimile: (305) 668-8892

*Attorneys for AHMSI Insurance Agency, Inc.
d/b/a Belt Line Insurance Agency*

BRIAN W. TOTH, ESQ.
brian.toth@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue., Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

KATHERINE L. HALLIDAY, ESQ.
khalliday@buckleysandler.com
BUCKLEYSANDLER LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000

ROSS E. MORRISON, ESQ.
rmorrison@buckleysandler.com
BUCKLEYSANDLER LLP
1133 Avenue of the Americas, Suite 3100
New York, NY 10036
Telephone: (212) 600-2315

*Attorneys for Defendants QBE Financial
Institution Risk Services Inc., QBE Insurance
Corporation, and QBE Specialty Insurance
Company*

EDWARD SOTO, ESQ.
tedward.soto@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3177
Facsimile: (305) 374-7159

DAVID J. LENDER, ESQ.
david.lender@weil.com
KEVIN F. MEADE, ESQ.
kevin.meade@weil.com
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Defendants WL Ross & Co.,
LLC, WLR AHM Co-Invest, L.P.,WLR IV
Parallel ESC, L.P., WLR Recovery Fund
III, L.P., WLR Recovery Fund IV, L.P.,
WLR/GS Master Co-Investment, L.P.*

COREY LEE, ESQ.
leec@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

BRIAN V. OTERO, ESQ.
botero@hunton.com
RYAN A. BECKER, ESQ.
rbecker@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
Telephone: (212) 309-1000
Facsimile: (212) 309-1100

*Attorneys for Defendant Homeward
Residential Holdings, Inc.*

/s/Adam M. Schachter
ADAM M. SCHACHTER